## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No.: 1:20-cr-** |
| **v.** | : | |
| | : | |
| **AIRBUS SE,** | : | |
| | : | |
| Defendant. | : | |
| | : | |

## INFORMATION

The United States charges:

### GENERAL ALLEGATIONS

### Relevant Statutory Background

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2.      The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President to control, among other things, the export of defense articles deemed critical to the national security and foreign policy interests of the United States. By Executive Order 13637, the President delegated this authority to the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), empowering DDTC to review and grant export licenses for the transfer or retransfer of defense articles and defense services identified on the United States Munitions List ("USML"). DDTC is located in the District of Columbia. Pursuant to its authority under the AECA, DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R.

§§ 120-130, which contained the USML. Accordingly, the export of USML defense articles and defense services is governed by the AECA and ITAR.

3.      Pursuant to the AECA and ITAR, certain Applicants (as defined in 22 C.F.R. § 130.2) applying for export licenses were required to inform DDTC as to whether the Applicant or its Vendors (as defined in 22 C.F.R. § 130.8) had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale or transfer of a defense article or defense service. The purpose of this provision was to provide Executive Branch oversight of the sale of U.S. military technology and prevent "improper influence" in those sales. H.R. REP. 94-1144, 58, 1976 U.S.C.C.A.N. 1378, 1434. Under these provisions, for defense articles or defense services valued in an amount of $500,000 or more that are sold commercially to or for the use of the Armed Forces of a foreign country or international organization (as defined in 22 C.F.R. § 130.3), an Applicant must report to the DDTC any payments or agreements to pay (i) political contributions of $5,000 or more, and (ii) fees and commissions of $100,000 or more. 22 C.F.R. §§ 130.1, 2.

4.      Further, all Applicants to the DDTC and their Vendors had an ongoing obligation to correct any false statements or omissions on previous arms export license applications, including false statements or omissions covered by Part 130.

5.      Additionally, under 22 C.F.R. § 130.14, each Applicant, Supplier (as defined in 22 C.F.R. § 130.7), and Vendor was required to maintain a record of any information it was required to furnish or obtain under Part 130 and all records upon which its reports were based for a period of not less than five years following the date of the report to which they pertained.

## Airbus SE and Other Relevant Entities and Individuals

6.     The defendant, Airbus SE, was a publicly traded company on the Euro Stoxx 50 market with headquarters in Leiden, Netherlands. The defendant Airbus SE's main office was in Toulouse, France. The defendant Airbus SE was a holding company that operated worldwide through its subsidiaries and affiliated entities, including subsidiaries and affiliated entities that were located in the United States (collectively "Airbus" or the "Company"). Airbus had approximately 136,000 employees.

7.     Airbus was founded in 2000 as the European Aeronautic Defence & Space Company NV ("EADS NV"). In or about January 2014, EADS NV changed its name to Airbus Group NV, and Airbus Group NV became the parent company. In or about May 2015, Airbus Group NV changed its name to Airbus Group SE, and Airbus Group SE became the parent company. In or about April 2017, Airbus Group SE changed its name to Airbus SE, and the defendant Airbus SE became the parent company. Airbus SE is the lawful successor-in-interest to EADS NV, Airbus Group NV, and Airbus Group SE.

8.     During the relevant period, Airbus's business was organized into divisions. The structure changed and was progressively simplified over the period, but there were broadly three divisions: (i) the Commercial Division, which handled, among other things, the manufacture and sale of civilian aircraft to airlines; (ii) the Defence & Space Division, which handled, among other things, the manufacture and sale of military aircraft, satellites, unmanned aerial systems, and other products and services used by governmental agencies; and (iii) the Helicopters Division, which handled the manufacture and sale of helicopters and related equipment and services.

9.     "Airbus Executive 1," whose identity is known to the United States and the defendant, was an executive with senior responsibilities within Airbus during relevant times.

3

10. "Airbus Executive 2," whose identity is known to the United States and the defendant, was an executive with senior responsibilities within Airbus during relevant times.

11. "Airbus Executive 3," whose identity is known to the United States and the defendant, was an executive within Airbus during relevant times.

12. "Airbus Executive 4," whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus during relevant times.

13. "Airbus Executive 5," whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus during relevant times.

14. "Airbus Executive 6," whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus China during relevant times.

15. "Airbus Executive 7," whose identity is known to the United States and the defendant, was an executive within Airbus during relevant times.

16. "Chinese Government Entity 1," "Chinese Government Entity 2," and "Chinese Government Entity 3" were agencies and instrumentalities of the Chinese government that made aircraft purchasing decisions in the People's Republic of China ("China") for state-owned and state-controlled airlines. Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3 are "agencies" and "instrumentalities" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-3.

17. "Consultant 1," whose identity is known to the United States and the defendant, was an agent of Airbus in or about and between 2013 and 2015 who, among other things, received payments from Airbus that were intended to be used as bribes to influence government officials in China, including employees and individuals acting on behalf of Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3.

4

18.     "Consultant 2," whose identity is known to the United States and the defendant, was an employee of Airbus in or about and between 2000 and 2007, and was an agent of Airbus in or about and between 2007 and 2015. Consultant 2 reported to Airbus Executive 4 and Airbus Executive 5. Consultant 2 introduced Airbus to Consultant 1.

19.     "Consultant 3," whose identity is known to the United States and the defendant, was an agent of Airbus in or about and between 2009 and 2015 who, among other things, assisted Airbus with concealing payments it made to Consultant 1.

20.     "Chinese Official 1," whose identity is known to the United States and the defendant, was an employee of Chinese Government Entity 1 during all relevant times. During all relevant times, Chinese Official 1 was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

21.     "Chinese Official 2," whose identity is known to the United States and the defendant, was an employee of Chinese Government Entity 3 during all relevant times. During all relevant times, Chinese Official 2 was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

## Business Partners and the Strategy and Marketing Organization

22.     From in or about and between 2008 and 2015, Airbus SE, through its employees, executives, and agents, including members of the Strategy and Marketing Organization ("SMO") and others, engaged in and facilitated a massive scheme to offer and pay bribes to decision makers and other influencers, including to foreign officials in multiple countries, in order to obtain improper business advantages and to win business from both privately owned enterprises and entities that were state-owned and state-controlled. In furtherance of the corrupt bribery

scheme, Airbus employees and agents, among other things, sent emails while located in the United States and traveled to the United States.

23.     The SMO was created within Airbus in approximately 2008. From at least in or about and between 2008 and 2015, a division of the SMO, SMO International, had sole responsibility within Airbus for managing all third-party business partners that were engaged to assist Airbus's Commercial Division – that is the division within Airbus that was responsible for selling planes and services to customers engaged in the commercial airline industry. During the same period, SMO International also reviewed and approved applications for business partners that were involved in assisting the Defence & Space Division and the Helicopters Division. While the business partner relationships were intended to be managed directly by the Defence & Space Division and the Helicopters Division, there were some business partners who were used across all Airbus divisions, and thus in practice, SMO International was also involved in managing certain business partners for the Defence & Space Division and the Helicopters Division.

24.     SMO International was the SMO division in charge of Airbus's business development activities. SMO International was comprised of two operational sub-divisions, International Operations and International Development. SMO International's mission was to support sales in all divisions of Airbus, and specifically to manage Airbus's international business development, strategy and marketing activities outside its home markets and the United States, including the identification, engagement, and supervision of third party business partners and International Marketing and Development Projects ("IMD Projects").

25.     From in or about and between 2008 and 2015, SMO had approximately 150 employees. SMO International had an annual maximum allowance of approximately 300 million U.S. Dollars to engage business partners and manage IMD Projects for Airbus Commercial. Airbus

funded the SMO International allowance primarily through quarterly reimbursements sent from Airbus Commercial. Payments for the Defence & Space Division and Helicopters Division business partners were mostly made directly from those divisions.

26.     Although SMO International was responsible for agreements with business partners, approval for the business partners was formally given by the Company Development and Selection Committee ("CDSC"). The CDSC included, at different times, Airbus Executive 1, Airbus Executive 3, and other Airbus executives and employees of the SMO. The CDSC met approximately on a monthly basis, and its main responsibilities included approving IMD projects, approving submitted proposals concerning the selection of potential business partners, and finalizing agreements with business partners.

27.     From in or about and between 2008 and 2015, Airbus, through its employees, executives, and agents, engaged in and facilitated a scheme to offer and pay bribes to decision makers and other influencers, including to foreign officials in multiple countries, in order to obtain improper business advantages and to win business from both privately owned enterprises and entities that were state-owned and state-controlled.

28.     In order to conceal and to facilitate the corrupt bribery scheme, Airbus engaged certain business partners, in part, to assist in the bribery scheme, and to offer and make the bribe payments to foreign officials.

29.     In order to conceal the amount of money corrupt business partners received, among other things, Airbus Executive 3 and others funneled payments to business partners from bank accounts not directly affiliated with Airbus, including by making payments through other business partners and using loan schemes. The business partners that were used as intermediaries for payments to other business partners would keep a portion of the amount as payment for services

that were falsely described in contracts and invoices and that were never provided. In certain instances, Airbus Executive 3 structured overall financial commitments to a single business partner using separate agreements with various business partners.

30.     Airbus Executive 3 maintained internal spreadsheets with annotations that showed the actual and intended recipients of Airbus payments to business partners. Airbus Executive 3 shared these spreadsheets with certain Airbus employees.

31.     SMO International disguised and concealed the true purpose of the engagement of the corrupt business partners in a number of ways, including by creating fake and fraudulent contracts, receiving fake and fraudulent invoices for services that were never performed, creating fake activity reports on behalf of business partners, developing certain "special projects" and investment opportunities that were actually designed as an elaborate and secret way to fund business partners, and by concealing relationships with certain business partners by, among other things, only engaging in oral agreements, using fake non-reimbursable loans, and paying the business partners indirectly.

32.     In or around October 2014, Airbus froze all payments to business partners engaged on sales campaigns for the Commercial Division and subsequently froze payments to all business partners for the Defence &Space and Helicopters Divisions in May 2015. The freeze was in effect when the SMO was formally dissolved by Airbus.

33.     Certain employees and executives at Airbus that did not have an official role within SMO International and/or did not have direct oversight over SMO International's activities were aware of and involved in SMO International's bribery scheme.

34.     For example, Airbus Executive 5, who did not have an official role within or direct oversight over SMO International, personally requested SMO International's assistance

in certain sales campaigns where corrupt payments were discussed, had direct contact with certain business partners, and took certain acts in furtherance of the corrupt bribery scheme – including sending emails in furtherance of the scheme while located in the United States.

35.     In addition, Airbus Executive 5 and others provided lavish travel and entertainment to foreign officials and discussed business with them while located within the United States, including with executives of Chinese state-owned airlines associated with the China sales campaigns described in further detail below.

### Overview of the China Bribery Scheme

36.     Chinese Government Entity 1 was a Chinese government agency that oversaw various industries and approved infrastructure projects in China, including projects in the aviation sector.

37.     Chinese Government Entity 2 was a Chinese government agency that supervised aviation in China. Chinese Government Entity 1 participated in the approval of Chinese Government Entity 2's five-year plan for acquiring aircraft for the state-owned and state-controlled airlines in China.

38.     After Chinese Government Entity 2 received approval, in part from Chinese Government Entity 1 to acquire aircraft, it instructed Chinese Government Entity 3, another department of the Chinese government, to negotiate and enter into an agreement referred to as a "General Terms Agreement" to purchase aircraft from airplane manufacturers such as Airbus. A General Terms Agreement included the type and volume of aircraft to be delivered by the airplane manufacturer to the state-owned and state-controlled airlines in China, as well as the delivery dates. During the General Terms Agreement approval process, Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3 were in dialogue with each other. General

Terms Agreements signed between Airbus and Chinese Government Entity 3 referred to Chinese Government Entity 3 as the commercial representative for the Chinese airlines.

39.     In or about and between 2013 and 2015, Airbus employees and executives, including Airbus Executive 2 and Airbus Executive 5, caused Airbus to engage Consultant 1 to facilitate and conceal bribe payments intended to be paid to Chinese officials in order to obtain or retain business in China, including to obtain and retain General Terms Agreements.

40.     In or about and between 2013 and 2015, Airbus, together with others, including certain executives, employees, and agents, knowingly and willfully conspired to make payments, which it believed were to be used as bribes and which it intended to be used as bribes, in connection with the approval of certain General Terms Agreements in China.

41.     In order to conceal the payments and to conceal its engagement of Consultant 1, Airbus did not pay Consultant 1 directly. Instead, Airbus made payments to a bank account in Hong Kong in the name of a company controlled by Consultant 3, and Consultant 3 then transferred a portion of the money to a bank account controlled by, or for the benefit of, Consultant 1.

42.     The payments were intended, in part, for the purpose of paying bribes for the benefit of foreign officials employed by departments of the Chinese government that approved the General Terms Agreements with Airbus, including Chinese Official 1 and Chinese Official 2, to secure improper advantages and to influence those foreign officials in order for Airbus to obtain and retain business in China, including two General Terms Agreements in 2014.

43.     In addition, in furtherance of the bribery scheme, Airbus, through its employees, executives, and agents, invited executives from certain Chinese state-owned and state-controlled airlines, and occasionally their families, to travel to the territory of the United States to

10

participate in all expense-paid events, including events held at Park City, Utah, and Maui, Hawaii. Airbus employees, including Airbus Executive 4, Airbus Executive 5, and Airbus Executive 6, and others, traveled to the United States and elsewhere to provide these benefits to the Chinese airline executives, to attend these events with them, and at times, to discuss business opportunities.

44.     For example, executives from certain Chinese state-owned and state-controlled airlines, as well as executives from other airlines, attended an event hosted at a luxury resort in Maui, Hawaii, from 28 July through 2 August 2013 with Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives. The event in Hawaii included golf, scuba diving, snorkeling cruises, horseback riding, ocean kayaking, surfing lessons, and cocktail and luau dinner receptions. A daily half-hour business-related presentation was scheduled in the early mornings, along with side meetings with individual customer airlines, while the rest of the agenda was dedicated to leisure and entertainment activities.

### Details of the China Bribery Scheme

45.     During 2013, SMO International, on behalf of Airbus, began discussions to engage Consultant 1 in order to assist Airbus with obtaining and negotiating General Terms Agreements in China. Airbus did not retain any executed agreements with Consultant 1 that described the nature, scope, or terms of the agreement with Consultant 1.

46.     Consultant 2 provided the original introduction between Consultant 1 and Airbus. Consultant 2 described Consultant 1 as someone who was retained due "to his long term relationship with the political level . . . and knowing personally some key decision makers of the customer."

47.     On or about October 22, 2013, Consultant 1 sent an email to Airbus Executive 2, in which he described his interactions with Chinese officials on behalf of Airbus and

11

stated: "I have committed: All payment shall be made subject to mutual acceptable method. It is also our intention is same as yours 'not to cause any embarrassment.'"

48.     Consultant 2 communicated directly with Airbus Executive 5, Airbus Executive 6, Airbus Executive 7 and other Airbus executives responsible for sales of commercial aircraft regarding Airbus Executive 2's communications and interactions with Consultant 1 and Consultant 1's interactions with Chinese officials.

49.     Consultant 1 requested proof of his engagement with Airbus, in the form of a "comfort letter," which would confirm that Consultant 1 would be receiving payments from Airbus that were intended for the Chinese government officials. Consultant 2 notified Airbus executives that Airbus Executive 2 delayed in providing a comfort letter to Consultant 1 and warned that Airbus would suffer consequences as a result, in the form of lower aircraft quantities approved by the Chinese government officials in the upcoming General Terms Agreements.

50.     For example, on or about October 29, 2013, Consultant 2 communicated to Airbus Executive 5 by email that Airbus Executive 2 had a deadline of November 15, 2013 to "firm up with" a "paper" or comfort letter.

51.     Subsequently, on or about November 20, 2013, Consultant 2 sent an email to Airbus Executive 5, stating that he was "in a difficult position to push for more detailed information," because of what Airbus Executive 2 "did not deliver so far to the contacts . . ."

52.     On or about December 5, 2013, in an email copying Airbus Executive 4, Airbus Executive 5 informed Airbus Executive 2 and Consultant 2: "We need support in China!" Approximately three days later, on or about December 8, 2013, Consultant 2 responded to Airbus Executive 5 that Airbus had the opportunity to protect its market share on single-aisle aircraft and

obtain dominant market share for wide-body aircraft, and that Airbus Executive 5 was aware of "the associated required resources."

53.    In or around March 2014, SMO International proposed a company affiliated with Consultant 1 for a business partner relationship in China.

54.    At around the same time, as described in the following paragraphs, Consultant 2 communicated with Airbus executives by email that delays in delivering the monetary commitment to Chinese government officials would affect the number of aircraft approved by the Chinese government in the upcoming General Terms Agreement.

55.    On or about March 15, 2014, Consultant 2 wrote to Airbus Executive 6 that the situation would end in "disaster" if Airbus Executive 2 did not take measures. Consultant 2 explained that if nothing happened by March 25, 2014 "there is risk of an impact on General Terms Agreement quantities…"

56.    Prior to Airbus and Chinese Government Entity 3 signing a General Terms Agreement on or about March 26, 2014, Consultant 2 notified Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives on March 25, 2014, that due to Airbus Executive 2's inaction, the quantity of aircraft proposed by Chinese government officials in the General Terms Agreement would be 50, which was a lower quantity than Airbus had expected. Consultant 2 referred to the lower quantity as a clear "warning" from the Chinese government officials. Consultant 2 explained that Consultant 1 informed Airbus Executive 2 of the reasons for the lower quantity of aircraft.

57.    Thereafter, on March 26, 2014, in advance of the signing of the General Terms Agreement, Consultant 2 notified Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and another Airbus executive that the final quantity of aircraft in the General Terms

13

Agreement would be 70 aircraft, that matters had not been settled with Airbus Executive 2, and that Airbus should not ask for a higher quantity from the Chinese government.

58.     On or about March 26, 2014, Airbus and Chinese Government Entity 3 signed a General Terms Agreement for 70 aircraft, consisting of 43 single-aisle aircraft and 27 wide-body aircraft.

59.     On the same day, on or about March 26, 2014, Consultant 2 emailed Airbus Executive 5 that he was "very frustrated as much as you are. . . . warnings, signals, reactions have been crystal clear and reported every time. . . . At least this time we know perfectly what happened. . . . For this afternoon, the information had been passed to our side clearly."

60.     On or about April 24, 2014, Consultant 2 emailed Airbus Executive 5 about Airbus Executive 2's planned April 29 meeting with Consultant 1 and communicated that when discussions with Airbus Executive 2 "move," Airbus could be assured with a 50% market share, but when such discussions were stuck, the aircraft quantities in the General Terms Agreement would be cut.

61.     On or about April 24, 2014, Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives were notified that Chinese Government Entity 2 passed a regulation promoting airlines in China to use wide-body aircraft on domestic flights, which Airbus was promoting in its sales campaigns in China. On or about April 25, 2014, Consultant 2 emailed Airbus Executive 5 that if the "issue (the real issue) with [Airbus Executive 2] is closed or under a serious path of being closed," Consultant 2 would "be able to push stronger this regulation issue" with the Chinese government authorities.

62.     On or about May 28, 2014, Consultant 2 emailed Airbus Executive 6 that it could be beneficial for Airbus if Airbus Executive 5 were to meet with representatives from the

Chinese government agencies involved in the aviation industry, and that Airbus Executive 2 still had "to implement some things" in order for the government officials to be "in positive listening mode."

63.     In or around June 2014, Airbus Executive 5 planned his upcoming visit to China in coordination with Consultant 2, who attempted to arrange meetings between Airbus Executive 5 and Chinese government officials. On or about June 13, 2014, Consultant 2 wrote to Airbus Executive 5 that he had difficulties arranging the meetings because Airbus was unable to secure the "paper," and he wrote: "Consequences: unhappiness. No meetings so far."

64.     On or about June 16, 2014, Consultant 2 emailed Airbus Executive 5 that he was able to secure a private dinner for Airbus Executive 5 with Chinese Official 1 of Chinese Government Entity 1 and Chinese Official 2 of Chinese Government Entity 3. Consultant 2 stated that he was doing the best he could "with empty hands" but that there was "no real thing moving as far as no concrete steps are taken" by SMO International.

65.     On or about June 22, 2014, Consultant 2 emailed Airbus Executive 5 about the aforementioned dinner between Airbus Executive 5 Chinese Official 1 and Chinese Official 2, stating that no one would be "positive" unless the "document" was kept safely and "flow of concrete evidence starts."

66.     On or about June 24, 2014, Airbus Executive 3 sent an email to a notary in Geneva, Switzerland, stating that he was contacting the notary on recommendation of Airbus Consultant 3.

67.     On or about June 28, 2014, Consultant 2 emailed Airbus Executive 7 regarding Consultant 1's communications with Chinese government officials. Specifically, Consultant 1 reported that Chinese Official 1 had been under "extreme pressure" to have dinner

with Airbus Executive 5 and to give the clear message to Airbus that the "door" would be "closed until you deliver."

68.     On or about July 2, 2014, Airbus executives, including Airbus Executive 1, Airbus Executive 2, Airbus Executive 3, and others, discussed over email replacing the authorization to engage Consultant 1's company in China with authorization to proceed with Consultant 3's company.

69.     On or about July 9, 2014, Airbus Executive 2 forwarded a text message from Consultant 1 to Airbus Executive 1. In the text message, Consultant 1 wrote that Airbus Executive 4 was received by the government officials at Chinese Government Entity 1 and Chinese Government Entity 2. Consultant 1 cautioned Airbus Executive 2 that "Your people should now understand how our system works . . . it's the first time no package given . . . no matter how much pressure you hv [sic] put on from political and diplomatie [sic] front, its not my nature to see this since we are friends. I want to complete all pending issues with your support ASAP to avoid further head ache for you & me: 1). Deposit the paper; 2). Agreement on normal marketing flow; 3). Details project implementation agreement. We need to complete the above 3 tasks ASAP if [Airbus Executive 4] wants to achieve those he wishes before year end, I think [Airbus Executive 4] rvd the strongest signal from our people during his visit!"

70.     On or about July 21, 2014, the CDSC approved the proposed business partner relationship between Consultant 3's company and Airbus. The agreement with Consultant 3 was purportedly for a separate business arrangement in China, but it was really designed as a means to provide money to Consultant 1.

71.     On the following day, on or about July 22, 2014, Airbus Executive 2 signed a consulting agreement with Consultant 3's company covering the period July 2013 to December

2014. To support this fake consulting agreement, Consultant 3 subsequently submitted an activity report to Airbus regarding its purported contributions in supporting the separate business arrangement, which Consultant 3 never actually assisted with. Airbus Executive 3 was a custodian of an electronic document that began with wording identical to the wording included in the submitted activity report.

72.     On or about July 23, 2014, Airbus Executive 5 sent an email to Airbus Executive 4 stating that Airbus was facing "difficult political opposition" in "China" and requesting that SMO International inquire into Consultant 3's company for help with campaigns in China. Airbus Executive 5 claimed in the email that he was unaware of Consultant 3's company but that SMO International recommended it. The email was forwarded by Airbus Executive 4 to Airbus Executive 1, confirming the "business requirements" related to Consultant 3.

73.     On or about July 24, 2014, the head of Compliance at Airbus Group emailed Airbus Executive 5, identifying a contradiction in the CDSC's meeting minutes from March 11, 2014: the minutes stated that the request for business partner support in China came directly from Airbus's Commercial Division, whereas Airbus Executive 5 was now stating that he was unaware of Consultant 3's company.

74.     That same day, on or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, sent an email responding to the head of Compliance at Airbus Group and directing him to alter the CDSC meeting minutes referenced above.

75.     That same day, on or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, emailed other Airbus executives and reiterated that changing the CDSC minutes would be "the best way forward."

76.     On or about July 28, 2014, Airbus paid Consultant 3 10.35 million Euros (approximately 14 million U.S. Dollars) under the business partner agreement related to Airbus's separate business arrangement in China, referenced in paragraphs 70-71 above. The funds were wired by Airbus to Consultant 3's bank account in Hong Kong but were intended for Consultant 1 for his assistance with the General Terms Agreements. SMO International spreadsheets and correspondence indicated that Airbus paid Consultant 1 10.35 million Euros (14 million U.S. Dollars) via a payment to an entity owned by Consultant 3.

77.     On or about August 13, 2014, Consultant 2 emailed Airbus Executive 6, copying Airbus Executive 5, regarding Airbus Executive 5's upcoming meeting with Chinese Official 1 in China in September. Consultant 2 indicated that none of SMO International's commitments has been fulfilled, and that Consultant 2 was risking his credibility.

78.     On or about August 21, 2014, Airbus Executive 7 sent an email to Airbus Executive 4 and Airbus Executive 5 stating that Consultant 1, whom he referred to as Airbus Executive 2's "friend," "didn't get the expected good news" and that "even if first action shows up in next 2/3 weeks . . . it will most probably be urgent also to progress very quickly on the 'document' management."

79.     On or about August 23, 2014, Consultant 2 sent an email to Airbus Executive 7, stating that Consultant 1 had resent his bank details to Airbus Executive 2 and Airbus Executive 3 and was "ballistic" that Airbus Executive 3 had sent Consultant 1 a text that Airbus rejected the "first good news."

80.     On or about August 26, 2014, Consultant 2 emailed Airbus Executive 5 that Chinese Official 1 was considering dinner with Airbus Executive 5 in Beijing but that dinner was "dependent upon the first good news." Subsequently, on or about September 5, 2014, Consultant

2 notified Airbus Executive 5 that he was able to arrange for him to have dinner with Chinese Official 1 during his upcoming visit to China in September. Consultant 2 warned Airbus Executive 5 that "the discussion will be difficult: still drastic lack of confirmed trust as they want to have the evidence of a stable and smooth implementation of what was committed and after nearly one year and a half of renewed contact."

81.     In or around September 2014, Consultant 1 and Airbus Executive 3 discussed by email how Consultant 1 would be paid for his services. Airbus Executive 3 wrote to Consultant 1 that a Middle Eastern "sending company" would be providing Consultant 1 with a loan and attached a draft loan facility agreement in which another entity owned by Consultant 3 was listed as the lender. Airbus Executive 3 emailed Consultant 1 a draft loan facility agreement for an amount of 7.7 million Euros, which listed Consultant 3's Lebanese company as the lender. The notice provision in the agreement set forth that notices to the lender should be addressed to Consultant 3. According to an email by Airbus Executive 3, the loan facility agreement was intended to "speed up the last delivery."

82.     On or about September 10, 2014, after Consultant 1 indicated to Airbus Executive 3 that he wanted to redraft the loan agreement, Airbus Executive 3 asked if Consultant 1 had a preferred "special & secure number" to use for a telephone conversation. Airbus Executive 3 also wrote "please advise receipt of second batch I boosted to 50% making now 70% total."

83.     On the following day, on or about September 11, 2014, Consultant 2 emailed Airbus Executive 4 and Airbus Executive 5, and subsequently Airbus Executive 7, regarding his discussions with Consultant 1 about outstanding payments from Airbus and the Chinese officials' internal discussions regarding their plans to acquire single-aisle and wide-body aircraft from Airbus. On the basis of his discussion with Consultant 1, Consultant 2 warned that

19

the Chinese officials would not move forward in their acquisition of aircraft from Airbus "as far as: 1 – what is due as of today and since January 2013 is done with a minimum of what has been promised (as of tonight only 18% has arrived and for the rest method not acceptable at all) 2- Paper is kept has already organized but process brutally interrupted with no explanation so far."

84.     On the same day, on or about September 11, 2014, Airbus Executive 5 responded to Airbus Executive 4 and Consultant 2 by email that Chinese Official 1 "must stop the sabotage" and that a state-owned Chinese airline was ready to finalize a deal with Airbus for its wide-body aircraft, but Chinese Official 2 "actively discouraged any A330 [wide-body] deals with Airbus." Airbus Executive 5 wrote "This must change. [Chinese Government Entity 1] ([Chinese Official 1]) and [Chinese Government Entity 2] must be actively supportive." In response to Airbus Executive 5's email, Consultant 2 responded that Chinese Official 1 was not the only one blocking Airbus, but that it was a "system" and that Chinese Official 1 and Chinese Official 2 "are the windows." In response, Airbus Executive 5 wrote to Airbus Executive 4 and Consultant 2 "[W]e must 'open the windows.'" Consultant 2 responded to Airbus Executive 4 and Airbus Executive 5, "I gave you some windows and doors . . . we are all and still waiting for the keys . . . after exactly one year and a half." In response, Airbus Executive 5 directed Consultant 2 to call him on his cellular telephone.

85.     In or around late September 2014, Airbus Executive 3 and Consultant 1 exchanged emails on how to "unlock" the "past and on-going" "transaction(s)." Consultant 1 communicated to Airbus Executive 3 that he could not proceed on his current recommendation; Airbus Executive 3 forwarded Consultant 1's email to Airbus Executive 2, stating that he needed a "document" to make further payments to Consultant 1.

86.     At around the same time, the CDSC considered a retrospective engagement of Consultant 1's company, which was ultimately not signed. An internal Airbus document stated that Consultant 1's company would provide broader support for Airbus commercial campaigns in China than Consultant 3's company and that Consultant 1 was a "Chinese businessman who demonstrated in the past his capability to lobby Chinese administration." The document referenced an "expected remuneration" of 18 million U.S. Dollars.

87.     On or about October 11, 2014, Airbus and Chinese Government Entity 3 signed a General Terms Agreement for 70 single-aisle aircraft.

88.     In or around late October 2014, Airbus froze all payments to business partners engaged on sales campaigns for the Commercial Division.

89.     At around the same time, Consultant 1 threatened litigation against Airbus over payments that Consultant 1 claimed Airbus owed him. For example, on or about October 26, 2014, Consultant 1 sent an email to Airbus Executive 2 in which he referenced the "two legal binding document[s]" signed by Airbus Executive 2 on behalf of Airbus and "with full acknowledge of your senior management." Subsequently, when Airbus Executive 7 forwarded Consultant 1's email to Consultant 2 and asked whether he should inform Airbus Executive 5 of the threatened litigation, Consultant 2 advised to wait until a meeting occurred with Consultant 1 in Hong Kong. At around the same time, Airbus Executive 7 discussed with Consultant 2 alternative ways to compensate Consultant 1 for his assistance with the General Terms Agreements, including whether "projects" could be set up in order to compensate Consultant 1.

90.     On or about October 26, 2014, Consultant 1 also emailed Airbus Executive 2 that his agreement with Airbus had not been cancelled and that he did not know whom to communicate with at Airbus. Consultant 1 wrote that he wanted the contact information for Airbus

21

Executive 2's successor "in order to continue to work and implement based on the platform you built and agreement signed."

91.     On or about November 26, 2014, Consultant 2 sent an email to Airbus Executive 4 and Airbus Executive 5, stating that Chinese Official 2 "is still the window to structure the deals" in China and that Airbus executives could meet with Chinese Official 1's successor in the future. Consultant 2 wrote "On one hand some at the Central such as [Chinese Government Entity 1] are blocking (informally) . . . on the other hand they are still keeping the door slightly open as: 1. Nobody told them it was over 2. They feel very confident firm commitments can be proven anytime 3. They know and agree to play with the new methods scheme a <<positive exit>> from the present situation."

### Travel and Entertainment of Chinese Foreign Officials

92.     Airbus China and Chinese Government Entity 3 established a Fund ("Fund") in 2011 via a handshake agreement between Airbus Executive 6 and Chinese Official 2. Airbus China made monetary contributions to the Fund; certain Airbus employees expected that, in exchange, Chinese Government Entity 3 would speed up the allocation of aircraft to airlines in China in relation to General Terms Agreements signed that year and the previous year.

93.     The stated purpose of the Fund was to support projects "related to services for the Chinese commercial aviation industry, including but not limited to aviation related management education, seminars, and pilot educational facilities." In reality, the Fund was used, in part, to pay event agencies to host social events for Chinese government officials, including members of Chinese Government Entity 3 and executives of the Chinese airlines.

94.     Under the Fund's governing documents, an appointed Fund committee, composed of members from Airbus China, including Airbus Executive 6, and an official from

Chinese Government Entity 3 were responsible for administering the Fund as well as evaluating and approving proposed events and projects to be supported by the Fund. Once an event or project was approved, suppliers were engaged to organize the social events. Some of the suppliers were fully or partially owned by Chinese Government Entity 3 or the Chinese airlines.

95.     From 2012 to 2017, the Fund was used to support 13 events and projects, including golf retreats and leisure events that had limited business-related content, and which fell outside the stated purpose of the Fund. Chinese Official 2 was the originator of at least five of these events.

96.     Airbus Executive 5's approval was sought for six of these events. For example, on or about February 10, 2014, an Airbus employee emailed Airbus Executive 5, copying Airbus Executive 6, and seeking Airbus Executive 5's "final approval" for an "urgent sponsorship." The employee described a golf invitational in China aimed at top level officials of Chinese airlines and stated that the event would be paid for by the Fund. On or about February 14, 2014, Airbus Executive 5, while in the territory of the United States, emailed his approval of the leisure event to Airbus Executive 6 and the Airbus employee who initially sought Airbus Executive 5's approval.

97.     The Fund was also used to fund leisure trips in China, which were attended by executives from Chinese Government Entity 1, Chinese Government Entity 2, Chinese Government Entity 3, certain executives from Chinese state-owned and state-controlled airlines, and several employees of Airbus China.

### Overview of AECA and ITAR Violations

98.     Airbus had knowledge of its requirements under ITAR Part 130. Airbus's violations of the ITAR, including willful violations of ITAR Part 130, were the result of several

23

factors, including: the Company's ongoing use of business partners in its sales of ITAR-controlled defense articles and defense services; willful efforts and reluctance by certain Company employees to prevent disclosure of business partner relationships and payments; the Company structuring the compliance function as separate and siloed from business sales and the export compliance function, which prevented accurate ITAR compliance; and the Company failing to provide adequate training about ITAR Part 130 for its employees. As a result, Airbus willfully failed to report or under-reported political contributions, fees, and commissions to the DDTC.

99.     Had political contributions, fees, and commissions paid by Airbus (through the SMO or otherwise) been properly reported to the DDTC as part of Airbus's ITAR filings, such disclosure could have triggered oversight by DDTC and other agencies, including in the form of a referral by DDTC to law enforcement. If the DDTC had known that Airbus willfully submitted applications that contained false or incomplete ITAR Part 130 certifications, the DDTC would not have approved the relevant license applications.

100.     Airbus's relevant conduct occurred in several locations, including but not limited to Airbus's headquarters in France and its subsidiaries in Germany, Spain, and the United States, with the direct involvement, knowledge, and approval of Airbus management personnel.

### Airbus's Knowledge of Part 130 Requirements

101.     Beginning in or around September 2009 and no later than in or around June 2011, Airbus was aware of the ITAR Part 130 requirements regulating the disclosure of political contributions, fees, and commissions paid in connection with sales of defense articles and defense services, as applied to Airbus's business partners. Specifically, in or around September 2009, a memorandum entitled "Part 130 ITAR-U.S. Requirements Under the International Traffic in Arms Regulations for Providing Information on Fees, Commissions, and Contributions" was circulated

by a senior compliance employee at the Defence & Space Division, Airbus Export Compliance Employee 1. The memorandum also included on its distribution list a senior executive in the SMO with knowledge of the Company's use of business partners. Further in the fall of 2009, export compliance leadership at Airbus's U.S. subsidiary discussed the application of ITAR Part 130 to non-U.S. persons and retransfer requests, in connection with sales campaigns of the Eurofighter Typhoon aircraft. By April 2010, Airbus senior export compliance staff within the Defence & Space Division, including Airbus Export Compliance Employee 1, discussed the need to establish a procedure to furnish required information regarding political contributions, fees, or commissions to the DDTC. Despite this discussion, no action was taken by the Company to establish a procedure to furnish the requisite information to the DDTC.

102.   In May 2011, the U.S. Department of State entered into a consent agreement with BAE Systems PLC, regarding BAE's noncompliance with the ITAR, including Part 130, and BAE's willful false statements regarding the same (hereinafter "BAE consent agreement"). Following the news of the BAE consent agreement, Airbus discussed its compliance with its obligations under Part 130, and multiple senior-level export compliance officials at Airbus's parent group and within the Defence & Space Division corresponded about the applicability of ITAR Part 130 to various Airbus products, including Eurofighter Typhoon aircraft. For instance, in June 2011, a senior export compliance officer at the French subsidiary stated to the senior export compliance officer at Airbus's parent group that Airbus "cannot escape the obligations created by ITAR" when re-exporting Airbus products to end users other than those originally licensed by the DDTC. In late 2011, an export compliance officer at the French Defence & Space subsidiary wrote an internal memorandum on the ITAR, including on Part 130, which discussed the requirements of the ITAR,

the scope of reporting obligations under Part 130, and how Part 130 applied to intermediaries or brokers.

103.    Subsequently, Airbus discussed ITAR Part 130 compliance with its joint venture partners with whom it manufactured the Eurofighter Typhoon aircraft, showing its awareness of its obligations under the ITAR. In the fall of 2012, one of the joint venture partners specifically told Airbus that DDTC had questioned the joint venture partner about the ITAR and whether the other joint venture partners, including Airbus, were complying with Part130. The joint venture partner also shared with Airbus its own internal policy related to Part 130.

104.    Moreover, in 2013 and 2014, management at Airbus discussed whether ITAR Part 130 filings were required for certain specific sales campaigns, further evidencing Airbus's knowledge of its reporting requirements in the context of actual sales.

105.    Additionally, Airbus received communications from the DDTC regarding compliance with ITAR Part 130 that further put Airbus on notice of its disclosure obligations. On January 18, 2013, DDTC issued to Airbus an advisory opinion noting the "requirements of the ITAR that are applicable to . . . reporting of political contributions, fees and commissions under Part 130." The same year, compliance managers at Airbus received and reviewed DDTC's industry-wide guidance on ITAR Part 130 filing requirements. In December 2014, DDTC contacted Airbus's U.S. subsidiary "as a precaution and to prompt thinking at Airbus" about Part 130 disclosures in the context of specific product sales related to border security. Personnel at Airbus' U.S. subsidiary escalated the DDTC's concerns to Airbus colleagues in Germany and France working on the relevant sales campaign.

**Airbus's Willful Efforts to Conceal Payments to Business Partners from ITAR Disclosure**

106.    Airbus willfully concealed its political contributions, fees, and commissions paid to business partners in conjunction with the sale or transfer of defense articles and defense services. During the relevant ITAR time period, Airbus was paying political contributions, fees, and commissions in coordination with sales campaigns and contracts for Airbus products that contained ITAR-controlled defense articles and defense services. Specifically, the Defence & Space Division, which incorporates ITAR-controlled defense articles within most of its products, used business partners during the relevant ITAR time period. The Helicopters Division, which also has ITAR-controlled defense articles in many of its products and whose customers could choose to add optional ITAR-controlled defense articles to their helicopters, used business partners during the relevant ITAR time period. Some of the business partners used by the Defence & Space Division and Helicopters Division were approved by SMO International, and certain Defence & Space Division and Helicopters Division business partners were managed by SMO International. Moreover, several of the SMO International's most-frequently used business partners were used on sales of both commercial aircraft and defense articles and defense services. However, Airbus's failure to comply with ITAR Part 130 occurred regardless of whether the business partner was associated with SMO International.

107.    Airbus willfully obscured from oversight the activity of SMO International, and Airbus more generally, in the payments of political contributions, fees, and commissions to business partners on sales of defense articles and defense services. For instance, as early as June 2011, Airbus Export Compliance Officer 1 stated, "I doubt that we will ever open our books on a business partner" when discussing whether Airbus was required to report business partner payments to a U.S. supplier under ITAR Part 130.

### Failure of Export Compliance Internal Controls

108.    With knowledge of the ITAR Part 130 requirements, Airbus repeatedly discussed setting internal policies and procedures for ITAR Part 130. As early as June 2013, senior export compliance management at the Defence & Space Division circulated an internal Airbus memorandum that identified risk related to ITAR Part 130 disclosures and recommended an internal policy and procedure addressing compliance with Part 130. Some of the same export compliance management were aware during this time period that Airbus used business partners in sales by the Defence & Space Division. Numerous times over the next four years, senior export compliance management discussed instituting an ITAR Part 130 compliance policy. Nonetheless, Airbus did not adopt any policy on ITAR Part 130 until December 30, 2016, despite the fact that the issues were discussed by senior managers in positions to make changes.

109.    Although Airbus had policies and procedures designed to ensure that the Company complied with the ITAR, Airbus failed to train its employees adequately to ensure that employees who certified information as part of ITAR license applications fully complied with Airbus's policies and procedures, and assured compliance with the ITAR, and specifically with ITAR Part 130.

### Lack of Oversight of Export Compliance Process

110.    In and around July 2015, the newly appointed in-house General Counsel at Airbus's parent company identified potential issues with the ITAR Part 130 disclosure framework. In response to these concerns, senior export control officers appeared reluctant to change the company's existing compliance process. Specifically, a senior export compliance executive wrote to the General Counsel that adequate processes and procedures were in place, stating that, regarding DDTC applications: (i) "proper due diligence was done prior to signature" on the

application, (ii) templates used "ensure[d]" attention to ITAR Part 130 representations and (iii) each application was "reviewed carefully to ensure that . . . [it] meets the obligations of Part 130 whether a required statement needs to be included or not." These statements were reviewed by senior export compliance management prior to being made.

111.    In fact, as described further herein, adequate processes and procedures were not in place to ensure compliance with ITAR Part 130 during the relevant ITAR time period, and the aforementioned export compliance management knew the same.

### Part 130 Violations

112.    ITAR license applications were often signed by export compliance personnel at the relevant Airbus business component (*i.e.*, the Defence & Space Division or Helicopters Division subsidiary in the country of production), although at times they were signed by U.S. export compliance personnel. Export compliance personnel at the business components were generally aware that business partners were used, but they did not personally have access to any business partner agreements and did not know which business partners were associated with which Airbus sales campaigns. The Company's export compliance personnel did not personally verify the payments of political contributions, fees, and commissions, and generally did not inquire with sales personnel about the same. Nonetheless, these same export compliance personnel routinely signed certifications on ITAR license applications attesting that no political contributions, fees, and commissions had been paid as a part of the sale and export of the defense articles and defense services for which Airbus was seeking DDTC approval. In fact, a template for ITAR license applications used by Airbus during the relevant ITAR time period had as the standard language that "no political contributions, fees, and commissions had been paid." The template was

sent to compliance managers in the United States, Spain, and France for review and comment after its creation in June 2011.

113.   Airbus's U.S.-based export compliance staff filed or assisted in the filing of many of the ITAR license applications. Specifically, the U.S.-based export compliance staff would ensure the proper paperwork was filed, but the representations contained therein regarding the requesting entity, end user, and purpose for the item were furnished by the relevant Airbus business component located outside the United States. U.S.-based export compliance staff performed no independent due diligence outside the certifications provided by their colleagues outside the United States prior to filing ITAR Part 130 disclosures. Moreover, U.S.-based export compliance staff worked in a separate office from the underlying sales teams and did not verify the use of business partners on specific sales campaigns.

## ITAR Violations

114.   Airbus filed numerous license applications during the relevant ITAR time period. Airbus violated ITAR Part 130 by paying political contributions, fees, and commissions on at least forty transactions and failing to properly report the same to the U.S. Department of State, as required. In general, Airbus repeatedly filed license applications with the DDTC stating that ITAR Part 130 did not apply to the application, claiming that no business partner payments were made, and attesting to the accuracy of any ITAR Part 130 disclosures when in fact Airbus did nothing to verify the accuracy of those statements.

115.   Additionally, Airbus routinely failed to adhere to the recordkeeping obligations of 22 C.F.R. § 130.14 for its license applications, which required Airbus to keep records related to the license applications for a period of five years.

**Willful Violation of Part 130 – C-295 Exports**

116. During the relevant ITAR time period, Airbus manufactured C-295 airplanes, which were a twin-turboprop tactical military transport aircraft. Airbus sold C-295 military aircraft to various countries and their Armed Forces. The C-295s sold by Airbus generally included defense articles subject to regulation under the ITAR.

117. Airbus's C-295 aircraft were manufactured in Spain by a Defence & Space subsidiary. Certain ITAR-controlled defense articles from U.S. suppliers were component parts of the C-295. When these items were exported from the United States to Spain, the U.S. suppliers were responsible for filing an export license application with the DDTC. Depending on the circumstance, the export license application would list either the Airbus subsidiary in Spain or an identified customer as the end user of the defense article. In instances where Airbus was listed as the end user, Airbus would eventually complete the production of the C-295 and sell it to a later identified Airbus customer. In those cases, Airbus was responsible for filing a subsequent export license application with the DDTC, informing the DDTC that Airbus's customer would be the new end user for the defense article (hereinafter "re-export license applications"). As part of those re-export license applications, Airbus included statements regarding the applicability of ITAR Part 130 to the re-export (hereinafter "Part 130 certifications" or "certifications"). Airbus repeatedly filed re-export license applications with the DDTC relating to C-295s that included false or incomplete certifications related to ITAR Part 130, as well as re-export license applications that failed to include any certifications about ITAR Part 130.

**Willful Violation of Part 130 - Ghana**

118. Airbus completed two campaigns to sell C-295 aircraft to the Republic of Ghana ("Ghana") in 2009 and 2015, resulting in the sale of three C-295s during this period, for

two of which were the subject of false ITAR Part 130 certifications and for one of which there was no application filed because the re-export did not meet the requirements of ITAR Part 130. Several Airbus senior executives from Airbus Defence & Space were directly involved in the Ghana sales campaign.

119.    The first contract between Airbus and Ghana was signed on August 3, 2011, selling two C-295s. Airbus delivered the two aircraft on November 17, 2011, and March 19, 2012, respectively. Airbus filed ITAR license applications with the DDTC for the transfer of the defense articles in these two C-295s to Ghana under license numbers GC 2715-11 (approved November 30, 2011) and GC 2020-12 (approved August 30, 2012). In those license applications, Airbus stated that the transaction met the requirements of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The applications were signed by export compliance management (Airbus Export Compliance Employee 2) at the Defence & Space Division's Spanish subsidiary.

120.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales in the amount of at least 3,596,523.75 Euros.

121.    Between 2009 and 2016, Individual 1, a citizen of Ghana, was a high-ranking elected government official in Ghana during the relevant ITAR time period. Beginning in or around 2009, a few months after Individual 1 took office, Individual 1 was in direct and repeated contact with senior Airbus executives from both the Defence & Space Division and SMO International about Airbus sales campaigns. Individual 1 was influential in having the Government of Ghana approve aircraft purchases, and Individual 1 contacted Airbus senior executives during

32

the government approval process. In 2011, during Individual 1's time in office, the Ghanaian Parliament approved the 2011 purchase of two C-295 aircraft.

122.    In connection with the sales to Ghana, beginning on or about January 1, 2009, the Defence & Space Division's Spanish subsidiary contracted with Individual 1's brother, Consultant 4, a citizen of Ghana and the United Kingdom, to act as a third-party consultant for Airbus during the C-295 sales campaigns. Airbus purposefully sought to engage Consultant 4 due to his closeness to Individual 1, and Airbus management included Consultant 4 in their communications with Individual 1. Airbus used Consultant 4 as a conduit for messages intended for Individual 1. Consultant 4 traded on his access to Individual 1.

123.    Consultant 5, a citizen of the United Kingdom, worked in conjunction with Consultant 4 to assist in the sale. Consultant 4 and Consultant 5 initially were engaged by Airbus without any written business partner agreement and without Airbus completing due diligence.

124.    Airbus initially agreed to pay Consultant 4, through a company owned by Consultant 4 and Consultant 5, in excess of 3,500,000 Euros for the Ghana C-295 sales campaign. Airbus worked with Consultant 4 and Consultant 5 for two years before submitting a business partner application to Airbus's compliance staff.

125.    In October 2011, Airbus's compliance staff rejected the proposed contract between Airbus and Consultant 4 and Consultant 5's company because Consultant 4 had a familial relationship to Individual 1. Specifically, Airbus compliance staff found that "the shareholders of this company are so close to the decision makers."

126.    Thereafter, due to the scrutiny of using Consultant 4 as a business partner, senior leadership in SMO International and the Defence & Space Division concocted a plan to deliberately circumvent Airbus's compliance rules. Specifically, the Airbus executives proposed

33

to pay Consultant 4 via Organization 1. Organization 1 was a Spanish-based third-party business partner of Airbus, which Airbus had previously used on other Defence & Space campaigns. Organization 1 was in good standing with SMO International. Organization 1 had no prior affiliation with Consultant 4 or Consultant 5. Airbus used Organization 1 solely as a pass-through entity to obscure the involvement and payment of Consultant 4 in sales transactions; Organization 1 did not undertake any third-party business partner activity in Ghana in connection with the 2011 campaign to sell two C-295 aircraft to the Government of Ghana.

127.    Under this scheme, on March 20, 2012, Airbus entered into a contract with Organization 1 to provide business partner services on the C-295 Ghana campaign. Although the agreement was signed on March 20, 2012, it stated that the effective date for the contract was January 1, 2010. The agreement was signed by Airbus Defence & Space management. The agreement noted that Organization 1's "operational address" was in Ghana, despite the fact that Organization 1 was operating in Spain. Under the agreement, Organization 1 would be provided a success fee for the C-295 aircraft sale. The success fee was calculated to be approximately 3,001,718 Euros, a similar amount to that previously promised to Consultant 4 (3.5 million Euros).

128.    Pursuant to the agreement, between March 2012 and February 2014, Airbus paid in excess of 3,500,000 Euros to Organization 1 in Spain. The payments on this contract were authorized by SMO International.

129.    Thereafter, Organization 1 transferred money to the account of the company owned by Consultant 4 and Consultant 5. Organization 1 took a percentage of the money prior to the transfer. In total, the company owned by Consultant 4 and Consultant 5 was paid in excess of 1,800,000 Euros in May 2012, related to the 2011 sale of two C-295s. Consultant 4 later claimed 71,393.40 Euros was still owed to him related to this sale.

130.   In February 2014, Airbus management at SMO International and the Defence & Space Division sought to extend Airbus's contract with Organization 1, related to a subsequent campaign to sell C-295 aircraft to Ghana. Airbus's compliance staff rejected the extension request and required that a new contract be signed. In March 2015, a request was submitted for Organization 1 to be paid 1,665,000 Euros for the 2015 sale of one C-295 aircraft to Ghana. In the request, it was noted that Organization 1 was "involved in previous sellings [sic]," but noted that no contract had been signed with Organization 1.

131.   Consultant 4 subsequently demanded from both Airbus and Organization 1 payment of 1,675,000 Euros in connection with the 2015 C-295 sale.

132.   Additionally, on or about March 28, 2012, Airbus made political contributions in the amount of 62,200 Euros to a Spanish foundation related to agricultural development in Ghana. This contribution was not initially disclosed on GC 2715-11 or GC 2020-12. Airbus subsequently disclosed the same to the State Department out of abundance of caution, as no direct link between these political contributions and the relevant C-295 sales has been identified to date.

### Willful Violation of Part 130 - Indonesia

133.   In or around 2010 through in or around 2015, Airbus entities attempted to sell C-295 military aircraft to Indonesia, resulting in the sale of eleven C-295s during this period, nine of which were the subject of false ITAR Part 130 certifications. Executives from the Defence & Space Division were directly involved in the sales campaigns. The sales campaign also involved some executives from SMO International, including Airbus Executive 3, with respect to engagement of third-party business partners in Indonesia.

134.    The first contract, which involved the sale of nine C-295s, was signed on February 15, 2012. Airbus filed an application with the DDTC for the transfer of the defense articles in these nine C- 295s to Indonesia, under license numbers GC 2106-12 (approved August 20, 2012), GC 2015-12 (approved September 17, 2012), GC 3713-12 (approved January 28, 2013), GC 3773-13 (approved January 28, 2013), GC 0397-12 (approved March 5, 2013), GC 2218-13 (approved August 23, 2013), GC 3459-13 (approved November 26, 2013), GC 0419-14 (approved March 6, 2014), GC 0221-14 (approved March 14, 2014), and GC 0843-14 (approved April 28, 2014). With one exception (GC 2218-13), Part 130 applied to these applications, and in them, Airbus either made no statement regarding 22 C.F.R. § 130, or stated that the transaction met the requirements of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The ITAR license applications were signed by Airbus Export Compliance Employee 2, an export compliance manager from the Defence & Space subsidiary in Spain.

135.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commission in connection with these sales, in the amount of approximately 16,100,000 Euros.

136.    Organization 2 was an Indonesian consultant company. Organization 2's founder claimed to have connections to Indonesia's political leadership. Organization 2 had a highly complex ownership structure, in which shares in the company were owned by groups of shareholders that included holding companies for additional shareholders. Organization 2 employed numerous former Indonesian high-ranking military and government officials.

137.    Organization 2 worked for both Airbus's Commercial and Defence & Space Division in Indonesia. Organization 2 began working for Airbus military aircraft campaigns in and

around 2010 on the basis of an oral agreement. Altogether, Airbus paid Organization 2 more than 14,000,000 Euros in connection with military aircraft sales in Indonesia.

138.    Airbus's relationship with Organization 2 was directly overseen by SMO International, including oversight by Airbus Executive 3. Specifically, with respect to Organization 2's engagement on military aircraft campaigns in Indonesia, Airbus Executive 3 reviewed and approved the contracts between Airbus and Organization 2. Airbus approved contracts with Organization 2 despite being told about compliance risks about Organization 2's existence, including that Organization 2's business address listed no sign of the company and that Organization 2's office space appeared partially vacant and generally unused. Organization 2 was at times listed among the most-frequently used business partners for SMO International. SMO International executives, including Airbus Executives 2 and 3, and executives from the Defence & Space Division met together with representatives from Organization 2 in June 2011 to discuss sales of C-295s to Indonesia.

139.    On February 20, 2012, after the sale of the C-295s to Indonesia was consummated, the Defence & Space Division submitted to Airbus compliance an application for Organization 2 to assist on the sales campaign, which by that time was already completed. On June 15, 2012, the agreement was approved and finalized, in which Airbus agreed to pay Organization 2 in connection with the sale of nine C-295s to the Indonesian Ministry of Defense, for use by the Indonesian Air Force. Airbus paid Organization 2 approximately 4,357,446 Euros under the agreement.

140.    In addition, Airbus promised to pay 11,200,000 Euros to Organization 3 in connection with the same sale. Organization 3 was an Indonesian-based business partner. Airbus entered into two agreements with Organization 3: (i) one on July 3, 2012, the day before the sale

37

was consummated; and (ii) one on July 27, 2012, both in relation to the sale of nine C-295 aircrafts and related technical and administrative support. Airbus's relationship with Organization 3 was also overseen by SMO International.

141.    Airbus paid Organization 3 a total of 9,147,093.26 Euros in connection with these agreements for the C-295 campaign.

### Willful Violation of Part 130 - Vietnam

142.    In or around 2009 through in or around 2014, Airbus attempted to sell military aircraft to the country of Vietnam, resulting in the sale of three C-295s during this period, all of which were the subject of false ITAR Part 130 certifications. Senior Airbus executives from the Defence & Space Division were directly involved in the Vietnam C-295 sales campaign, as well as some involvement of executives from SMO International.

143.    The aircraft contract between Airbus and the Vietnamese Ministry of Defense was signed on December 17, 2013, selling three C-295s. Airbus filed an ITAR license application with the DDTC for the transfer of the defense articles in these three C-295s to Vietnam, under license number GC 2015-14 (approved August 26, 2014). In that application, Airbus stated that the transaction met the requirements of 22 C.F.R. § 130.2, and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The ITAR license application was signed by Airbus Export Compliance Employee 2, an export compliance manager at the Defence & Space subsidiary in Spain.

144.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales, in the amount of 6,150,226 Euros.

38

145.     Organization 4 was a Hong Kong company doing business in Vietnam. Consultant 6, Consultant 7, and Consultant 8, all foreign nationals, were the controlling partners of Organization 4. Consultant 7 had long-standing personal connections with senior Vietnamese government officials as well as airline executives.

146.     Organization 4 began working for Airbus in or around 2002. Organization 4 commenced work for Airbus on commercial aircraft campaigns based on an oral agreement. Later, between October 2002 and July 2014, Airbus entered into numerous agreements with Organization 4 related to sales campaigns for Airbus commercial, defense, and helicopter products. However, in general, most consultant agreements between Organization 4 and Airbus were entered into retrospectively, following the success of a particular sales campaign.

147.     Airbus's relationship with Organization 4 was directly overseen by SMO International, including oversight by Airbus Executive 3. Specifically, Airbus Executive 3 reviewed and approved the contracts between Airbus Defence & Space and Organization 4. Consultant 6 was at times listed among the most-frequently used business partners for SMO International.

148.     On December 20, 2013, after the sale of the C-295s to Vietnam was consummated, Airbus entered into an agreement by which it agreed to pay Organization 4 a success fee, equivalent to 6,150,226 Euros, in connection with the successful C-295 sales campaigns in Vietnam. Airbus paid at least 2,935,541 Euros under this agreement.

149.     Airbus's gross gain on the sales of the aforementioned C-295s to Ghana, Indonesia, and Vietnam, on which Airbus failed to file or falsely filed Part 130 disclosures, was approximately $165,208,895.

### Willful Violation of Part 130 - Eurofighter

150.    During the relevant ITAR time period, Airbus manufactured Eurofighter
Typhoon aircraft, which were twin-engine fighter jets, together with two partners as part of a joint
venture. Eurofighter Typhoon aircraft manufactured by Airbus and its partners generally included
defense articles and were subject to regulation under the ITAR.

151.    Eurofighter Typhoon aircrafts were manufactured by a joint venture
company located in Germany, in which Airbus and two other companies each held shares. Certain
ITAR-controlled defense articles from U.S. suppliers were component parts of the Eurofighter
Typhoon aircraft.

152.    Pursuant to an agreement between the joint venture member companies,
each company was responsible for sales over a geographic region. Under the agreement, the
company responsible for the sale was responsible for filing the appropriate ITAR license
applications with the DDTC. Regarding disclosures under ITAR Part 130, in addition to
accounting for its own offers, agreements, or payments of political contributions, fees, or
commissions in connection with a sale, the company responsible for the sale was also responsible
for gathering information from the other joint venture member companies about any political
contributions, fees, or commissions offered, agreed, or paid by those companies.

153.    Under the agreement between the joint venture member companies, Airbus
contributed to sales efforts in Austria, among other locations, in support of the joint venture
company.

154.    Beginning in or around 2000, Airbus conducted a sales campaign to sell
Eurofighter Typhoon aircraft and related services to the Austrian Ministry of Defense, resulting in
the eventual sale of fifteen Eurofighter Typhoon aircraft and equipment and services related thereto

during this period, all of which contained ITAR-controlled content, and involved false ITAR applications. SMO International managed at least one of the business partners involved in this sale.

155. The contract between the joint venture company and the Austrian Ministry of Defence was signed in 2003, and later amended in 2007, selling fifteen Eurofighter Typhoon aircraft. Additionally, contracts related to equipment, services, and support of the Eurofighter Typhoon aircraft were signed in 2003, 2007, and 2011. Airbus filed ITAR license applications with the DDTC for the transfer of the defense articles in these fifteen Eurofighter Typhoon aircraft to Austria and the accompanying service agreements, under license number GC 0819-13 (approved May 31, 2013). In GC 0819-13, Airbus made no statements regarding the requirements of 22 C.F.R. § 130.2. GC 0819-13 was signed by senior export compliance management as well as a senior sales manager.

156. In fact, Part 130 was applicable to the sale because Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions, as defined in ITAR Part 130, in connection with these sales, in the amount of approximately 55,125,984 Euros.

157. In total, Airbus made payments to fourteen individuals, consultants, or organizations that should have been reported under Part 130. Of particular note:

    a. Consultant 9 was a consultant in Austria, hired by Airbus in connection with the Eurofighter Typhoon Austrian sales campaign. Between April 2002 and December 2009, Airbus paid 16,895,467 Euros to Consultant 9, plus a success fee equivalent to 2,750,000 Euros.

    b. Organization 5 was an Austrian company whose principal held a close familial connection to an Austrian government official. Both the principal and the Austrian government official were good friends of Consultant 9. On behalf of Airbus, Consultant 9 paid 87,600 Euros to Organization 5 for the development of an airshow.

    c. Organization 6 was an Austrian company and a third-party business partner of Airbus. In 2011, pursuant to a consultant agreement, Airbus paid 3,097,226 Euros to Organization 6 in connection with the Austria Eurofighter campaign. Airbus's relationship with Organization 6 was directly overseen by SMO International.

## STATUTORY ALLEGATIONS
## COUNT ONE

### (Conspiracy to Violate the Antibribery Provisions of the FCPA)

    158. Paragraphs 1 and paragraphs 6 through 97 of this Information are realleged and incorporated by reference as if fully set forth herein.

    159. In or about and between 2008 and 2015, both dates being approximate and inclusive, the defendant, Airbus SE, together with others, did knowingly and willfully combine, conspire, confederate, and agree to commit offenses against the United States, to wit: as a person other than an issuer or domestic concern, through and together with its officers, directors, employees, and agents, while in the territory of the United States, to willfully and corruptly make use of the mails and means and instrumentalities of interstate commerce and to do any act in furtherance of an offer, payment, promise to pay, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given and promised to a foreign official, for purposes of: (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist the defendant

Airbus SE in obtaining and retaining business for and with, and directing business to the defendant Airbus SE and others, contrary to Title 15, United States Code, Section 78dd-3.

## **Manner and Means**

160.    The manner and means by which Airbus SE and its co-conspirators sought to accomplish the objects of the conspiracy included, among other things, the following:

a.    Airbus SE, through its employees, executives, and agents, engaged in a scheme to offer and pay bribes to foreign officials in order to obtain improper business advantages and to win business from entities that were state-owned and state-controlled.

b.    In furtherance of the corrupt bribery scheme, Airbus SE, through its employees, executives, and agents, among other things, sent emails while located in the United States and traveled to the United States.

c.    In furtherance of the corrupt bribery scheme, Airbus SE, through its employees, executives, and agents, invited foreign officials from certain state-owned and state-controlled airlines, and occasionally their families, to travel to the territory of the United States to participate in all expense-paid events, including events held at Park City, Utah, and Maui, Hawaii, and traveled to the United States and elsewhere to provide these benefits to the foreign officials.

d.    In furtherance of the corrupt bribery scheme, Airbus SE, through its employees and agents, engaged third-party business partners to facilitate and conceal bribe payments offered and intended to be paid to foreign officials, including bribe payments intended to be paid to Chinese officials, in order for Airbus SE to secure improper advantages and to influence those foreign officials in order for Airbus SE to obtain and retain business, including to obtain and retain business in China.

### Overt Acts

161.   In furtherance of the conspiracy and to effect its objects, the defendant Airbus SE, together with others, committed and caused to be committed at least one of the following:

a.   On or about July 28, 2013 through on or about August 2, 2013, Airbus employees, including Airbus Executive 4, Airbus Executive 5, and Airbus Executive 6, traveled to the United States to attend an event hosted by Airbus SE at a luxury resort in Maui, Hawaii. Executives from certain Chinese state-owned and state-controlled airlines, as well as executives from other airlines attended the event.

b.   In or about and between 2013 and 2015, Airbus employees and executives, including Airbus Executive 2 and Airbus Executive 5, caused Airbus to engage Consultant 1 to facilitate and conceal bribe payments intended to be paid to Chinese officials in order to obtain or retain business in China, including to obtain and retain General Terms Agreements.

c.   On or about July 21, 2014, the CDSC approved a proposed business partner relationship between Consultant 3's company and Airbus. The agreement with Consultant 3 was purportedly for a separate business arrangement in China, but it was really designed as a means to provide money to Consultant 1.

d.   On or about July 22, 2014, Airbus Executive 2 signed a consulting agreement with Consultant 3's company covering the period July 2013 to December 2014. To support this fake consulting agreement, Consultant 3 subsequently submitted an activity report to Airbus regarding its purported contributions in supporting the separate business arrangement, which Consultant 3 never actually assisted with. Airbus Executive 3 was a custodian of an electronic document that began with wording identical to the wording included in the submitted activity report.

e.   On or about July 23, 2014, Airbus Executive 5 sent an email to Airbus Executive 4 stating that Airbus was facing difficult political opposition in China and requesting that SMO International inquire into Consultant 3's company for help with campaigns in China. Airbus Executive 5 claimed in the email that he was unaware of Consultant 3's company but that SMO International recommended it.

f.   On or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, sent an email to the head of Compliance at Airbus Group directing him to alter certain meeting minutes regarding Consultant 3.

g.   On or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, emailed other Airbus executives and reiterated that changing the meeting minutes would be "the best way forward."

h.   On or about July 28, 2014, Airbus paid Consultant 3 10.35 million Euros (approximately 14 million U.S. Dollars) under the business partner agreement related to Airbus's separate business arrangement in China. The funds were wired by Airbus to Consultant 3's bank account in Hong Kong but were intended for Consultant 1 for his assistance with the General Terms Agreements. SMO International spreadsheets and correspondence indicated that Airbus paid Consultant 1 10.35 million Euros (14 million U.S. Dollars) via a payment to an entity owned by Consultant 3.

i.   In or around September 2014, Consultant 1 and Airbus Executive 3 discussed by email how Consultant 1 would be paid for his services. Airbus Executive 3 wrote to Consultant 1 that a Middle Eastern "sending company" would be providing Consultant 1 with a loan and attached a draft loan facility agreement in which another entity owned by Consultant 3 was a listed as lender. Airbus Executive 3 emailed Consultant 1 a draft loan facility agreement for an amount

of 7.7 million Euros which listed Consultant 3's Lebanese company as lender. The notice provision in the agreement set forth that notices to the lender should be addressed to Consultant 3.

(All in violation of Title 18, United States Code, Section 371.)

## COUNT TWO
### (Conspiracy to Violate the Arms Export Control Act and the International Traffic in Arms Regulations)

162.    Paragraphs 2 through 26 and 98 through 157 of this Information are realleged and incorporated by reference as if fully set forth herein.

163.    From at least in or about and between December 1, 2011, and continuing through on or about December 1, 2016, in the District of Columbia and elsewhere, Airbus SE, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, that is, to violate the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 et seq., and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. § 130.

### Manner and Means

164.    The manner and means by which Airbus SE and its co-conspirators sought to accomplish the objects of the conspiracy included, among other things, the following:

a.    Airbus SE, through certain of its employees and agents, would hire and use multiple third-party intermediaries in the sale of ITAR-controlled defense articles and defense services to the armed forces of various foreign countries, including Ghana, Indonesia, Vietnam, and Austria.

b.    In connection with these sales, Airbus SE would pay political contributions, fees, and commissions to the third-party intermediaries and others.

46

c.      Airbus SE would file license applications to the Department of State, Directorate of Defense Trade Controls (DDTC), located in the District of Columbia, regarding the export of the aforementioned ITAR-controlled defense articles and defense services.

d.      In certain license applications, Airbus SE would fail to report the political contributions, fees, and commissions to DDTC, as required by Part 130 of the ITAR, or would wrongly state that Part 130 was inapplicable.

e.      Airbus SE would routinely fail to adhere to the recordkeeping obligations of 22 C.F.R. § 130.14 for its license applications, which required Airbus SE to keep records related to the license applications for a period of five years.

### Overt Acts

165.    In furtherance of the conspiracy and to effect the illegal objects thereof, overt acts, among others, were committed in the District of Columbia and elsewhere, including the acts set forth in the following paragraphs, which are hereby incorporated and realleged by reference: Paragraphs 116, 119-120, 133-134, 142-4, 154-6.

(All in violation of Title 18, United States Code, Section 371, Title 22, United States Code, Section 2778 et seq., and Title 22, Code of Federal Regulations, Section 130.)

## FORFEITURE ALLEGATION

166.    Upon conviction of either offense alleged in Count One or Count Two, Airbus SE shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to such offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). The United States will seek entry of a forfeiture money judgment equal to the value of property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

167.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of Airbus SE:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property that cannot be divided without difficulty;

Airbus SE shall forfeit to the United States any other property, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28 United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p).)

JESSIE K. LIU
United States Attorney
   D.C. Bar No. 472845

DAVID B. KENT
   D.C. Bar No. 482850
   202-252-7762
KAREN P.W. SEIFERT
   NY Bar No. 4742342
   202-252-7527
ZIA FARUQUI
   D.C. Bar No. 494990
   202-252-7117
Assistant U.S. Attorneys
MICHELLE A. ZAMARIN
Deputy Chief, Fraud
   D.C. Bar No 474240
   202-252-6931
GREGG MAISEL
Chief, National Security
   D.C. Bar No. 447902
   202-252-7812
U.S. Attorney's Office for
the District of Columbia
555 4th Street NW
Washington, D.C. 20530
Karen.Seifert@usdoj.gov
Zia.Faruqui@usdoj.gov
Michelle.Zamarin@usdoj.gov
Gregg.Maisel@usdoj.gov

ROBERT ZINK
Chief, Fraud Section
Criminal Division

ELINA A. RUBIN-SMITH
Trial Attorney
   NY Bar No. 4677548
   202-616-1617
VANESSA SISTI
Assistant Chief, FCPA Unit
   FL Bar No. 0012147
   202-616-2362
CHRISTOPHER CESTARO
Chief, FCPA Unit
   D.C. Bar No. 982224
   202-353-0726
Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Elina.Rubin-Smith@usdoj.gov
Vanessa.Sisti@usdoj.gov
Christopher.Cestaro@usdoj.gov

JAY I. BRATT
Chief, Counterintelligence
and Export Control Section
National Security Division

DAVID LIM
Trial Attorney
   PA Bar No. 313851
   202-514-0510
ELIZABETH CANNON
Deputy Chief
   D. C. Bar No. 974755
   202-233-2251
Counterintelligence and
Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Suite 7700
Washington, D.C. 20530
David.Lim2@usdoj.gov
Elizabeth.Cannon@usdoj.gov