## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No.: 1:20-cr-00021 (TFH)** |
| v. | : | |
| | : | |
| AIRBUS SE, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### DEFERRED PROSECUTION AGREEMENT

The defendant Airbus SE (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, and the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Department of Justice, National Security Division ("NSD"), and the United States Attorney's Office for the District of Columbia, Criminal Division (the "Office"), enter into this deferred prosecution agreement (the "Agreement").

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section, NSD, and the Office will file the attached two-count criminal Information (the "Information") in the United States District Court for the District of Columbia charging the Company with one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; and one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 et seq., and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"),

1

22 C.F.R. § 130.9, as well as a criminal forfeiture allegation. In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the District of Columbia. The Fraud Section, NSD, and the Office agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.      The Company admits, accepts and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees and agents as charged in the Information, and as set forth in the attached Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. Should the Fraud Section, NSD, or the Office pursue the prosecution that is deferred by the Agreement, the Company stipulates to the admissibility of the attached Statement of Facts in evidence in any proceeding by the Fraud Section, NSD, or the Office, including any trial, guilty plea or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

### Term of the Agreement

3.      The Agreement is effective for a period beginning on the date on which the Information is filed and ending three years from that date (the "Term"). The Company agrees, however, that, in the event the Fraud Section, NSD, and the Office determine, in their sole discretion, that the Company has knowingly violated any provision of the Agreement or has failed

to completely perform or fulfill each of the Company's obligations under the Agreement, an extension or extensions of the Term may be imposed by the Fraud Section, NSD, and the Office, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Fraud Section's, NSD's, and the Office's right to proceed as provided in Paragraphs 19–23 below. Any extension of the Agreement extends all terms of the Agreement, including the terms of the reporting requirement in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section, NSD, and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of the Agreement have been satisfied, the Agreement may be terminated early. If the Court fails to grant its approval for exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(2), all the provisions of the Agreement shall be deemed null and void, and the Term shall be deemed to have not begun.

### Relevant Considerations

4.      The Fraud Section, NSD, and the Office enter into the Agreement based on the individual facts and circumstances presented by this case and the Company, including:

#### The FCPA Case

a.      the Company did not receive voluntary disclosure credit for disclosure of the FCPA-related conduct because it disclosed the corruption-related conduct to the Fraud Section and the Office after the corruption-related investigation being undertaken by the Serious Fraud Office ("SFO") in the United Kingdom began and was made public, however, the Company did disclose the conduct to the Fraud Section within a reasonably prompt time of becoming aware of corruption-related conduct that might have a connection to the United States;

3

b.      the Company received full credit for its cooperation concerning the investigation of the FCPA-related conduct: by, among other things, (i) gathering evidence and performing forensic data collections in multiple jurisdictions; (ii) proactively identifying issues and facts that would likely be of interest to the Fraud Section and the Office; and (iii) making factual presentations to the Fraud Section and the Office;

c.      the Company provided to the Fraud Section, NSD, and the Office all relevant facts known to it, to the extent permitted under foreign law, including information about the individuals involved in the misconduct;

d.      the Company engaged in remedial measures, including separating and taking disciplinary action against former employees, ceasing to retain business partners involved in the misconduct, freezing payments to business partners and applying enhanced due diligence procedures, hiring new legal and compliance leadership, providing additional compliance training to employees, making enhancements to the Company's internal controls and compliance program;

e.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including by implementing heightened controls and additional procedures and policies relating to third parties, conducting a global risk-assessment and ongoing reviews of its compliance program, and ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to the Agreement (Corporate Compliance Program);

f.      based on the Company's remediation and the state of its compliance program, as well as the fact that the Company will separately be entering into a resolution with the Parquet National Financier ("PNF") in France and will be subject to oversight by authorities in France, including L'Agence Française Anticorruption, and the Company's agreement to report to

4

the Fraud Section, NSD, and the Office as set forth in Attachment D to the Agreement (Corporate Compliance Reporting), the Fraud Section, NSD, and the Office determined that an independent compliance monitor is unnecessary;

        g.     the Company has agreed to enter into a resolution with the PNF in France relating to the same conduct described in the Statement of Facts, and has agreed to pay 2,083,137,455 Euros in connection with the PNF resolution, a portion of which the Fraud Section, NSD, and the Office are crediting in connection with the penalty in the Agreement;

        h.     the Company has agreed to enter into a resolution with the SFO relating to the FCPA scheme described in the Statement of Facts, and has agreed to pay 990,963,712 Euros in connection with the SFO resolution, and the Fraud Section, NSD, and the Office are deferring that conduct to the SFO resolution;

        i.     the Company is neither a U.S. issuer nor a domestic concern, and the territorial jurisdiction over the corrupt conduct is limited; in addition, although the United States' interests are significant enough to warrant a resolution, France's and the United Kingdom's interests over the Company's corruption-related conduct, and jurisdictional bases for a resolution, are significantly stronger, and thus the Fraud Section and the Office have deferred to France and the United Kingdom to vindicate their respective interests as those countries deem appropriate, and the Fraud Section and the Office have taken into account these countries' determination of the appropriate resolution into all aspects of the U.S. resolution;

        j.     the nature and seriousness of the offense conduct, including the long duration of the bribery scheme, the involvement of executives at high levels of the Company, and the amount of bribe payments made to government officials;

k.      the Company has agreed to continue to cooperate with the Fraud Section, NSD, and the Office in any ongoing investigation as described in Paragraph 5 below; and

### The ITAR Case

l.      the Company's disclosure of the ITAR-related conduct was deemed to be a voluntary self-disclosure because the Company did voluntarily and timely disclose to NSD the willful ITAR-related conduct described in the attached Statement of Facts;

m.     the Company received credit for providing cooperation concerning the investigation of the ITAR-related conduct and committing to additional investigation of ITAR-related conduct during the Term;

n.      the Company engaged in remedial measures, including identifying and implementing key corrective actions as part of its efforts to remediate misconduct related to past violations of the ITAR and improve its export compliance program, hiring new legal and compliance leadership and dedicating additional resources, implementing procedures to ensure accurate ITAR Part 130 reporting and adopting an overarching Company export compliance directive, deploying enhanced export control training, and engaging multiple external auditors to perform assessments and testing of the Company's export compliance program;

o.      the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including by implementing heightened controls and additional procedures and policies relating to third parties, conducting a global risk assessment and ongoing reviews of its compliance program, increasing the resources the Company dedicates to compliance, and ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to the Agreement (Corporate Compliance Program);

p.      based on the Company's remediation and the state of its compliance program, as well as the fact that the Company will separately be entering into a resolution with the PNF and will be subject to oversight by authorities in France, an ITAR-related consent agreement with the State Department with a Special Compliance Officer, and the Company's agreement to report to the Fraud Section, NSD, and the Office as set forth in Attachment D to the Agreement (Corporate Compliance Reporting), the Fraud Section, NSD, and the Office determined that an independent compliance monitor is unnecessary;

q.      the nature and seriousness of the offense conduct, including the failure to properly disclose fees and commissions, as well as the use of brokers, including foreign nationals from prohibited countries, to the U.S. Department of State's Directorate of Defense Trade Controls ("DDTC");

r.      the Company has agreed to continue to cooperate with the Fraud Section, NSD, and the Office in any ongoing investigation as described in Paragraph 5 below; and

s.      After considering (a) through (r) above, the Fraud Section, NSD, and the Office agreed that the appropriate form of resolution of this matter was to defer prosecution pursuant to this Agreement.  In addition, regarding the FCPA-related conduct, based on the relevant portions of (a) through (k) above, the Company received full cooperation and remediation credit of 25 percent off the bottom of the applicable United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") fine range for the FCPA-related conduct.  Regarding the ITAR-related conduct, the financial penalties were calculated taking into consideration the relevant portions of (l) through (r) above.

### Future Cooperation and Disclosure Requirements

5.      The Company, including its direct and indirect subsidiaries and its majority-owned joint ventures, shall, subject to applicable law and regulations, cooperate fully with the Fraud Section, NSD, and the Office in any and all matters relating to the conduct described in the Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section, NSD, and the Office or any other component of the Department of Justice at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term specified in Paragraph 3 above.  At the request of the Fraud Section, NSD, and the Office, the Company, its direct and indirect subsidiaries and its majority-owned joint ventures, shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the Multilateral Development Banks ("MDBs"), in any investigation of the Company, its affiliates, or any of its present or former officers, directors, employees, agents and consultants, or any other party, in any and all matters relating to the conduct described in the Agreement and the Statement of Facts and other conduct under investigation by the Fraud Section, NSD, and the Office or any other component of the Department of Justice.  The Company's cooperation pursuant to this paragraph is subject to applicable law and regulations, including relevant foreign data privacy and national security laws, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Fraud Section, NSD, and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation or privilege, and the Company bears the burden of establishing the validity of any such an assertion.  The Company agrees that its cooperation pursuant to this Paragraph shall be subject to applicable laws and regulations and shall include, but not be limited to, the following:

8

a.      The Company, its direct and indirect subsidiaries and its majority-owned joint ventures shall truthfully disclose all factual information with respect to its activities, those of its parent company, its direct and indirect subsidiaries and its majority-owned joint ventures, its affiliates, and those of its present and former directors, officers, employees, agents and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Fraud Section, NSD, and the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company, its direct and indirect subsidiaries and its majority-owned joint ventures to provide to the Fraud Section, NSD, and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section, NSD, and the Office may inquire of the Company.

b.      Upon request of the Fraud Section, NSD, and the Office, the Company, its direct and indirect subsidiaries and its majority-owned joint ventures shall designate knowledgeable employees, agents or attorneys to provide to the Fraud Section, NSD, and the Office the information and materials as described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful and accurate information.

c.      The Company, its direct and indirect subsidiaries and its majority-owned joint ventures shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section, NSD, and the Office, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include

identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

      d.      The Company shall, within the Term, complete a full review of all of its files related to brokers (as defined in 22 C.F.R. § 129.2) used during the period of coverage under this agreement who had citizenship in, were located in, were incorporated in, or used banks located in any country designated in 22 C.F.R. § 126.1. The Company shall, within the Term, report findings regarding the same to the Fraud Section, NSD, the Office, and the DDTC.

      e.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Fraud Section, NSD, and the Office pursuant to the Agreement, the Company, its direct and indirect subsidiaries and its majority-owned joint ventures consent to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Fraud Section, NSD, and the Office, in their sole discretion, shall deem appropriate.

      f.      The Company shall provide information, materials, and testimony as necessary or requested to identify or to establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding.

      6.      In addition to the obligations in Paragraph 5, during the Term, should the Company or any of its direct or indirect subsidiaries or its majority-owned joint ventures or majority-owned affiliates learn of any evidence or allegation of conduct that may constitute a violation of the FCPA's anti-bribery provisions had the conduct occurred within the jurisdiction of the United States, the Company shall promptly report such evidence or allegation to the Fraud Section and the Office, subject to applicable laws and regulations. In addition to the obligations in Paragraph

5, during the Term, should the Company learn of any non-frivolous evidence or allegation of conduct that may constitute a criminal violation of the AECA or the ITAR, the Company shall promptly report such evidence or allegation to NSD and the Office.

**Payment of Monetary Penalty**

7.     The Fraud Section, the Office, and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis for the FCPA-related conduct:

a.     If the Company were convicted of the FCPA-related offense alleged in the Information, the 2018 USSG would be applicable to this matter.

b.     Offense Level.  Based upon USSG § 2C1.1, the total offense level is 48, calculated as follows:

| | |
|---|---|
| (a)(2)  Base Offense Level | 12 |
| (b)(1)  Multiple Bribes | +2 |
| (b)(2)  Value of benefit received more than $550,000,000 | +30 |
| High-Level Official | +4 |
| **TOTAL** | 48 |

c.     Base Fine.  Based upon USSG § 8C2.4(a)(1), the base fine is $1,743,315,734.

11

d.   Culpability Score.  Based upon USSG § 8C2.5, the culpability score is 8, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1) | the organization had 5,000 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | Cooperation, Acceptance | -2 |
| **TOTAL** | | 8 |

e.   Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $1,743,315,734 |
| Multipliers | 1.6(min) / 3.2(max) |
| Fine Range | $2,789,305,174/ $5,578,610,348 |

8.      The Fraud Section and the Office and the Company agree, based on the application of the Sentencing Guidelines to the FCPA-related conduct, that the appropriate criminal fine for the FCPA-related conduct is $2,091,978,881 ("Total Criminal Corruption Penalty").  This reflects a 25 percent discount off the bottom of the applicable Sentencing Guidelines fine range.  For the ITAR-related offense alleged in the Information, the Sentencing Guidelines fine range is not applicable under USSG § 8C2.1.  NSD, the Office, and the Company agree that, based on the relevant factors, including those set forth in and pursuant to Title 18, United States Code, Sections 3571(d) and 3572(a), and Title 22, United States Code, Section 2278(c), the appropriate fine for the ITAR-related conduct is $237,736,390 ("Total ITAR Penalty") and that the Company will also transfer to the United States, in a civil forfeiture action, its ownership interest in an identified bond worth 50,000,000 Euros, which bond is traceable to the proceeds of the ITAR-related conduct.  For

the portion of the fine amount calculated pursuant to Title 18, United States Code, Sections 3571(d), the alternative fine provision, the penalty imposed reflects a discount of more than 50 percent off the amount that would otherwise be available under that provision. The Fraud Section, NSD, the Office, and the Company agree that the appropriate total criminal penalty is $2,329,715,271 ("Total Criminal Penalty") and the ITAR-related civil forfeiture will be the additional transfer of an identified bond worth 50,000,000 Euros. The Fraud Section, NSD, the Office and the Company further agree that the Company will pay a criminal monetary penalty to the United States Treasury in the amount of $294,488,085 for the FCPA-related conduct and $232,736,390 for the ITAR-related conduct, and the Company will transfer to the United States in a civil forfeiture action, its ownership interest in an identified bond worth 50,000,000 Euros. The payment of $527,224,475 and the transfer of the ownership interest of the identified bond worth 50,000,000 Euros will be made no later than ten (10) business days after the Agreement is fully executed.

9.      The Fraud Section, NSD, the Office and the Company further agree that the Fraud Section, NSD and the Office will credit towards satisfaction of payment of the Total Criminal Penalty the amount the Company pays to French authorities, pursuant to the Company's resolution in France, up to a maximum of $1,797,490,796. The Fraud Section, NSD, the Office and the Company further agree that the Fraud Section, NSD and the Office will credit towards satisfaction of payment of the Total ITAR Penalty the amount the Company pays to the Department of State in connection with fines associated with the ITAR Consent Agreement entered into between the Company and DDTC, up to a maximum of $5,000,000. The Company's payment obligations to the United States under the Agreement will be complete upon the Company's payment of $527,224,475 and the transfer of the ownership interest of the identified bond of 50,000,000 Euros,

so long as the Company pays an additional $5,000,000 to the United States in a manner consistent with any payment schedule agreed to with the DDTC, and the Company pays the remaining amount of the Total Criminal Penalty (i.e. $1,797,490,796) to authorities in France, in a manner consistent with any payment schedule agreed to with the French authorities. Should any amount of such payments pursuant to the ITAR Consent Agreement entered into between the Company and DDTC or to the authorities in France not be made by the end of the Term, or be returned to the Company or any affiliated entity for any reason, the remaining balance of the Total Criminal Penalty will be paid to the United States Treasury.

10.    The Fraud Section, NSD, the Office and the Company further agree that this fine is appropriate given the facts and circumstances of this case, including the Relevant Considerations outlined in Paragraph 4 above. The Total Criminal Penalty and the forfeiture are final and shall not be refunded. Furthermore, nothing in the Agreement shall be deemed an agreement by the Fraud Section, NSD, and the Office that $2,385,079,771 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section, NSD, and the Office are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section, NSD, and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under the Agreement should be offset against any fine the Court imposes as part of a future judgment relating to the conduct described in the Statement of Facts. The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Total Criminal Penalty, including in France. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the fine amounts that the Company pays pursuant to the Agreement or any other amount that the

14

Company pays pursuant to any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts.

**Forfeiture Amount**

11.     As a result of the conduct described in count two of the Information and Statement of Facts, the Company agrees that its ownership interest in an identified bond worth 50,000,000 Euro will be forfeited to the United States (the "Forfeiture Amount"), pursuant to this Agreement.

a.     The Company agrees that the facts contained in the Information and the Statement of Facts establish that the Forfeiture Amount is subject to civil forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and that this Agreement, the Information, and the Statement of Facts shall be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Attachment E. The Company further agrees that the funds used to pay the Forfeiture Amount are derived from proceeds traceable to ITAR violations.

b.     The Company releases any and all claims it may have to the funds used to pay the Forfeiture Amount.

c.     By this agreement, the Company expressly waives any constitutional, statutory, or other challenge to the forfeiture of the Forfeiture Amount, including that the forfeiture constitutes an excessive fine or punishment, and consents to the forfeiture of the Forfeiture Amount to the United States. The Company agrees that it will not file a claim or otherwise contest the forfeiture of the Forfeiture Amount and will not assist or direct a third party in asserting any claim to the Forfeiture Amount.

d.     The Company agrees to execute any additional documents as necessary for the United States to complete the forfeiture of the Forfeiture Amount, including any forms evidencing

15

the Company's consent to forfeiture and waiver of timely notice. The Company also waives all rights to service or notice of any documents filed to effect the forfeiture, and any objection to *in rem* jurisdiction as to the Forfeiture Amount. The Company further agrees to the entry of a Final Order of Forfeiture against the Forfeiture Amount.

e.    The Company shall transfer the Forfeiture Amount and any associated transfer fees to the United States within ten (10) business days of the execution of this Agreement (or as otherwise directed by the Fraud Section, NSD, and the Office following such period).  Such payment shall be made pursuant to instructions provided by the Fraud Section, NSD, and the Office in their sole discretion.  If the Company fails to timely make the transfer required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Fraud Section, NSD, and the Office, in their sole discretion, choose to reinstate prosecution pursuant to Paragraphs 19 through 23 below. The Company certifies that the Forfeiture Amount is not the subject of any lien, security agreement, or other encumbrance.  Transferring encumbered property or failing to pass clean title in any way will be considered a breach of the Agreement.

f.    The Company agrees that the Forfeiture Amount shall be treated as a penalty to be paid to the United States government for all purposes, including all tax purposes.  The Company agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any forfeiture paid pursuant to this Agreement.

g.    The Forfeiture Amount paid is final and shall not be refunded should the Fraud Section, NSD, and the Office later determine that the Company has breached this Agreement and commence a prosecution against the Company.  In the event of a breach of this Agreement and subsequent prosecution, the Fraud Section, NSD, and the Office may pursue additional civil and

criminal forfeiture in excess of the Forfeiture Amount. The Fraud Section, NSD, and the Office agree that in the event of a subsequent breach and prosecution relating to the conduct set forth in the Statement of Fact, it will recommend to the Court that the amounts paid pursuant to this Agreement be offset against whatever fine or forfeiture the Court shall impose as part of its judgment. The Company understands that such a recommendation will not be binding on the Court.

### Conditional Release from Liability

12.     Subject to Paragraphs 19–23, the Fraud Section, NSD, and the Office agree, except as provided in the Agreement, that they will not bring any criminal case against the Company or its direct and indirect subsidiaries or its majority-owned joint ventures relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to the Agreement. Additionally, NSD and the Office agree that they will not prosecute the Company, including its corporate subsidiaries and majority-owned joint ventures under 22 C.F.R. §§ 126.1, 129, 130, and corresponding regulations related to the retention of records relevant to those provisions for conduct related to the Company's historical use of business partners between December 1, 2011, and continuing through on or about December 1, 2016.

13.     The Fraud Section, NSD, and the Office, however, may use any information related to the conduct described in the Statement of Facts against the Company: (i) in a prosecution for perjury or obstruction of justice; (ii) in a prosecution for making a false statement; (iii) in a prosecution or other proceeding relating to any crime of violence; (iv) in a prosecution or other proceeding relating to any additional violation of AECA or the ITAR; or (v) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     The Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.     In addition, the Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

14.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of the FCPA, AECA, ITAR, and other applicable anti-corruption and export control laws throughout its operations, including those of its affiliates, agents, and majority-owned joint ventures, and those of its contractors and subcontractors whose responsibilities include interacting with foreign officials or other activities carrying a high risk of corruption and regarding the sale and export of U.S.-controlled defense articles, including, but not limited to, the minimum elements set forth in Attachment C.

15.     In order to address any deficiencies in its internal accounting controls, policies and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under the Agreement, a review of its existing internal accounting controls, policies and procedures regarding compliance with the FCPA, AECA, ITAR, and other applicable anti-corruption and export control laws.   Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records and accounts; and (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed

to effectively detect and deter violations of the FCPA, AECA, ITAR, and other applicable anti-corruption and export control laws. The compliance program, including the internal accounting controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

### Corporate Compliance Reporting

16.     The Company agrees that it will report to the Fraud Section, NSD, and the Office annually during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

### Deferred Prosecution

17.     In consideration of the undertakings agreed to by the Company herein, the Fraud Section, NSD, and the Office agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to the Agreement.

18.     The Fraud Section, NSD, and the Office further agree that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section, NSD, and the Office will not continue the criminal prosecution against the Company as described in Paragraph 1 above and, at the conclusion of the Term, this Agreement shall expire. Within six months after the Agreement's expiration, the Fraud Section, NSD, and the Office shall seek dismissal with prejudice of the criminal Information filed against the Company as described in Paragraph 1 above, and agree not to file charges in the future against the Company based on the conduct described in the Agreement and the Statement of Facts.

19

**Breach of the Agreement**

19.     If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with the Agreement deliberately false, incomplete or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of the Agreement; (d) fails to implement a compliance program as set forth in Paragraphs 14 and 15 of the Agreement and Attachment C; (e) commits any acts that, had they occurred within the jurisdictional reach of the FCPA, would be a violation of the FCPA; or (f) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Fraud Section, NSD, and the Office become aware of such a breach after the Term is complete, the Company and its subsidiaries shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section, NSD, and the Office have knowledge, including, but not limited to, the charges in the Information as described in Paragraph 1 above, which may be pursued by the Fraud Section, NSD, and the Office in the United States District Court for the District of Colombia or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Fraud Section, NSD, and the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section, NSD, and the Office prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of the Agreement and the expiration of the Term plus one year. Thus, by signing the Agreement, the Company

20

agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of the Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section, NSD, and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

20.     In the event the Fraud Section, NSD, and the Office determine that the Company has breached the Agreement, the Fraud Section, NSD, and the Office agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section, NSD, and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section, NSD, and the Office shall consider in determining whether to pursue prosecution of the Company.

21.     In the event that the Fraud Section, NSD, and the Office determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Fraud Section, NSD, and the Office or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to the Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section, NSD, and the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of

21

Criminal Procedure, Rule 410 of the Federal Rules of Evidence or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section, NSD, and the Office.

22.     The Company acknowledges that the Fraud Section, NSD, and the Office have made no representations, assurances or promises concerning what sentence may be imposed by the Court if the Company breaches the Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in the Agreement binds or restricts the Court in the exercise of such discretion.

23.     On the date that the period of deferred prosecution specified in the Agreement expires, the Company, by the Chief Executive Officer and the Chief Financial Officer of the Company, will certify to the Fraud Section, NSD, and the Office that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement. Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

## Sale, Merger, or Other Change in Corporate Form of Company

24.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to

the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of the Agreement, whether such sale is structured as a sale, asset sale, merger, transfer or other change in corporate form, it shall include in any contract for sale, merger, transfer or other change in corporate form a provision binding the purchaser, or any successor-in-interest thereto, to the obligations described in the Agreement. The purchaser or successor-in-interest must also agree in writing that the Fraud Section's, NSD's, and the Office's ability to breach under the Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section, NSD, and the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer or other change in corporate form. The Fraud Section, NSD, and the Office shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of the Agreement. At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of the Agreement, the Fraud Section, NSD, and the Office may deem it a breach of this Agreement pursuant to Paragraphs 19–23 of the Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor-in-interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of the Agreement, as determined by the Fraud Section, NSD, and the Office.

## Public Statements by Company

25.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts.  Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 19 – 23 of the Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached the Agreement shall be at the sole discretion of the Fraud Section, NSD, and the Office.  If the Fraud Section, NSD, and the Office determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Fraud Section, NSD, and the Office shall so notify the Company, and the Company may avoid a breach of the Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee or agent of the Company in the course of any criminal, regulatory or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

24

26.     The Company agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with the Agreement, the Company shall first consult with the Fraud Section, NSD, and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, NSD, the Office and the Company; and (b) whether the Fraud Section, NSD, and the Office have any objection to the release.

27.     The Fraud Section, NSD, and the Office agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying the Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section, NSD, and the Office are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such authorities. Nothing in this Agreement restricts in any way the ability of the Fraud Section, NSD, and the Office, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, employees, or agents of the Company or against any other entities or individuals.  The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

**Limitations on Binding Effect of Agreement**

28.     The Agreement is binding on the Company, the Fraud Section, NSD, and the Office, but specifically does not bind any other component of the United States Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section, NSD, and the Office will bring the

25

cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

**Notice**

29.     Any notice to the Fraud Section, NSD, and the Office under the Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Christopher Cestaro, Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave NW, Washington, D.C. 20005; Elizabeth L. D. Cannon, Deputy Chief, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Suite 7700, Washington, D.C. 20530; as well as Gregg Maisel, Chief, National Security Section, and Michelle Zamarin, Deputy Chief, Fraud and Public Corruption Section, United States Attorney's Office for the District of Columbia, 555 Fourth Street NW, Washington, D.C., 20530, or by electronic mail to those individuals or to other individuals identified to the Company by the Fraud Section and the Office.  Any notice to the Company under the Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Robert Luskin and Nathaniel Edmonds, Paul Hastings, LLP, 875 15th Street, NW, Washington, D.C. 20005, or by electronic mail to those individuals or to other counsel or individuals identified to the Fraud Section and the Office by the Company.  Notice shall be effective upon actual receipt by the Fraud Section, NSD, and the Office or the Company.

**Execution in Counterparts**

30.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.  Further, all facsimile and digital images of

26

signatures shall be treated as originals for all purposes. The execution date shall be the last date when all signatories have signed the Agreement.

## Complete Agreement

31.      The Agreement, including its attachments, sets forth all the terms of the agreement between the Company, and the Fraud Section, NSD, and the Office. There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement. This Agreement supersedes any prior promises, agreements, or conditions between the Company and the Fraud Section, NSD, and the Office. The Company agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein. No amendments, modifications or additions to the Agreement shall be valid unless they are in writing and signed by the Fraud Section, NSD, and the Office, the attorneys for the Company and a duly authorized representative of the Company.

**AGREED:**

**AIRBUS SE:**

Date: 29 January 2020                    By: _____
                                              John Harrison
                                              Airbus SE

Date: 1/30/2020                          By: _____
                                              Robert D. Luskin
                                              Nathaniel Edmonds
                                              Jennifer Riddle
                                              Paul Hastings LLP

27

**FOR THE DEPARTMENT OF JUSTICE:**

ROBERT ZINK
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: 1/30/20                           BY: _____

Christopher Cestaro, Deputy Chief
Elina A. Rubin-Smith, Trial Attorney
Vanessa Sisti, Assistant Chief

JAY I. BRATT
Chief, Counterintelligence and Export
Control Section
National Security Division
United States Department of Justice

Date: 1/30/2020                         BY: _____

Elizabeth L. D. Cannon, Deputy Chief
David Lim, Trial Attorney

**FOR THE UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF
COLUMBIA:**

JESSIE K. LIU
United States Attorney
District of Columbia

Date: 1/30/2020                         BY: _____

Gregg Maisel, Chief, National Security Section
Michelle Zamarin, Dep. Chief, Fraud & Pub. Corruption
David Kent
Karen Seifert
Assistant United States Attorneys

## COMPANY OFFICER'S CERTIFICATE

I have read the Agreement and carefully reviewed every part of it with outside counsel for Airbus SE (the "Company"). I understand the terms of the Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement.

I have carefully reviewed the terms of the Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Company, in any way to enter into the Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the General Counsel for the Company and that I have been duly authorized by the Company to execute the Agreement on behalf of the Company.

Date: _29 January 2020_

Airbus SE

By: _____
John Harrison
General Counsel

## CERTIFICATE OF COUNSEL

I am counsel for Airbus SE (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of the Agreement with the Company Board of Directors.  Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into the Agreement on behalf of the Company and that the Agreement has been duly and validly authorized, executed and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of the Agreement with the Board of Directors and the General Counsel of the Company.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement.  To my knowledge, the decision of the Company to enter into the Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 1 | 30 | 2020

By: _____
      Robert D. Luskin
      Nathaniel Edmonds
      Jennifer Riddle
      Paul Hastings LLP
      Counsel for Airbus SE

A-2

**ATTACHMENT A**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), United States Department of Justice, National Security Division ("NSD"), the United States Attorney's Office for the District of Columbia (the "Office") (collectively, the "United States"), and the defendant Airbus SE. Certain of the facts herein are based on information obtained from third parties by the Fraud Section, NSD, and the Office through their investigation and described to Airbus. Airbus hereby agrees and stipulates that the following facts and conclusions of law are true and accurate. Airbus admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section, NSD, and the Office pursue the prosecution that is deferred by this Agreement, Airbus agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place during the relevant time frame and establish beyond a reasonable doubt the charges set forth in the Criminal Information attached to the Agreement.

**Background**

1.      The defendant, Airbus SE, was a publicly traded company on the Euro Stoxx 50 market with headquarters in Leiden, Netherlands. The defendant Airbus SE's main office was in Toulouse, France. The defendant Airbus SE was a holding company that operated worldwide through its subsidiaries and affiliated entities, including subsidiaries and affiliated entities that were located in the United States (collectively "Airbus" or the "Company"). Airbus had approximately 136,000 employees.

A-1

2.      Airbus was founded in 2000 as the European Aeronautic Defence & Space Company NV ("EADS NV"). In or about January 2014, EADS NV changed its name to Airbus Group NV, and Airbus Group NV became the parent company. In or about May 2015, Airbus Group NV changed its name to Airbus Group SE, and Airbus Group SE became the parent company. In or about April 2017, Airbus Group SE changed its name to Airbus SE, and the defendant Airbus SE became the parent company. Airbus SE is the lawful successor-in-interest to EADS NV, Airbus Group NV, and Airbus Group SE.

3.      During the relevant period, Airbus's business was organized into divisions. The structure changed and was progressively simplified over the period, but there were broadly three divisions: (i) the Commercial Division, which handled, among other things, the manufacture and sale of civilian aircraft to airlines; (ii) the Defence & Space Division, which handled, among other things, the manufacture and sale of military aircraft, satellites, unmanned aerial systems, and other products and services used by governmental agencies; and (iii) the Helicopters Division, which handled the manufacture and sale of helicopters and related equipment and services.

### The Bribery Conspiracy

*Relevant Individuals*

4.      Airbus Executive 1, whose identity is known to the United States and the defendant, was an executive with senior responsibilities within Airbus during relevant times.

5.      Airbus Executive 2, whose identity is known to the United States and the defendant, was an executive with senior responsibilities within Airbus during relevant times.

6.      Airbus Executive 3, whose identity is known to the United States and the defendant, was an executive within Airbus during relevant times.

A-2

7.      Airbus Executive 4, whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus during relevant times.

8.      Airbus Executive 5, whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus during relevant times.

9.      Airbus Executive 6, whose identity is known to the United States and the defendant, was an executive with senior responsibility within Airbus China during relevant times.

10.     Airbus Executive 7, whose identity is known to the United States and the defendant, was an executive within Airbus during relevant times.

11.     Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3 were agencies and instrumentalities of the Chinese government that made aircraft purchasing decisions in the People's Republic of China ("China") for state-owned and state-controlled airlines. Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3 are "agencies" and "instrumentalities" of a foreign government, as those terms are used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-3.

12.     Consultant 1, whose identity is known to the United States and the defendant, was an agent of Airbus in or about and between 2013 and 2015 who, among other things, received payments from Airbus that were intended to be used as bribes to influence government officials in China, including employees and individuals acting on behalf of Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3.

13.     Consultant 2, whose identity is known to the United States and the defendant, was an employee of Airbus in or about and between 2000 and 2007, and was an agent of Airbus in or

A-3

about and between 2007 and 2015. Consultant 2 reported to Airbus Executive 4 and Airbus Executive 5. Consultant 2 introduced Airbus to Consultant 1.

14.     Consultant 3, whose identity is known to the United States and the defendant, was an agent of Airbus in or about and between 2009 and 2015 who, among other things, assisted Airbus with concealing payments it made to Consultant 1.

15.     Chinese Official 1, whose identity is known to the United States and the defendant, was an employee of Chinese Government Entity 1 during all relevant times. During all relevant times, Chinese Official 1 was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

16.     Chinese Official 2, whose identity is known to the United States and the defendant, was an employee of Chinese Government Entity 3 during all relevant times. During all relevant times, Chinese Official 2 was a "foreign official," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

*Business Partners and the Strategy and Marketing Organization*

17.     From in or about and between 2008 and 2015, Airbus SE, through its employees, executives, and agents, including members of the Strategy and Marketing Organization ("SMO") and others, engaged in and facilitated a massive scheme to offer and pay bribes to decision makers and other influencers, including to foreign officials in multiple countries, in order to obtain improper business advantages and to win business from both privately owned enterprises and entities that were state-owned and state-controlled. In furtherance of the corrupt bribery scheme, Airbus employees and agents, among other things, sent emails while located in the United States and traveled to the United States.

18.     The SMO was created within Airbus in approximately 2008. From at least in or about and between 2008 and 2015, a division of the SMO, SMO International, had sole responsibility within Airbus for managing all third-party business partners that were engaged to assist Airbus's Commercial Division – that is the division within Airbus that was responsible for selling planes and services to customers engaged in the commercial airline industry. During the same period, SMO International also reviewed and approved applications for business partners that were involved in assisting the Defence & Space Division and the Helicopters Division. While the business partner relationships were intended to be managed directly by the Defence & Space Division and the Helicopters Division, there were some business partners who were used across all Airbus divisions, and thus in practice, SMO International was also involved in managing certain business partners for the Defence & Space Division and the Helicopters Division.

19.     SMO International was the SMO division in charge of Airbus's business development activities. SMO International was comprised of two operational sub-divisions, International Operations and International Development. SMO International's mission was to support sales in all divisions of Airbus, and specifically to manage Airbus's international business development, strategy and marketing activities outside its home markets and the United States, including the identification, engagement, and supervision of third party business partners and International Marketing and Development Projects ("IMD Projects").

20.     From in or about and between 2008 and 2015, SMO had approximately 150 employees. SMO International had an annual maximum allowance of approximately 300 million U.S. Dollars to engage business partners and manage IMD Projects for Airbus Commercial. Airbus funded the SMO International allowance primarily through quarterly reimbursements sent from

A-5

Airbus Commercial. Payments for the Defence & Space Division and Helicopters Division business partners were mostly made directly from those divisions.

21.     Although SMO International was responsible for agreements with business partners, approval for the business partners was formally given by the Company Development and Selection Committee ("CDSC"). The CDSC included, at different times, Airbus Executive 1, Airbus Executive 3, and other Airbus executives and employees of the SMO. The CDSC met approximately on a monthly basis, and its main responsibilities included approving IMD projects, approving submitted proposals concerning the selection of potential business partners, and finalizing agreements with business partners.

22.     From in or about and between 2008 and 2015, Airbus, through its employees, executives, and agents, engaged in and facilitated a scheme to offer and pay bribes to decision makers and other influencers, including to foreign officials in multiple countries, in order to obtain improper business advantages and to win business from both privately owned enterprises and entities that were state-owned and state-controlled.

23.     In order to conceal and to facilitate the corrupt bribery scheme, Airbus engaged certain business partners, in part, to assist in the bribery scheme, and to offer and make the bribe payments to foreign officials.

24.     In order to conceal the amount of money corrupt business partners received, among other things, Airbus Executive 3 and others funneled payments to business partners from bank accounts not directly affiliated with Airbus, including by making payments through other business partners and using loan schemes. The business partners that were used as intermediaries for payments to other business partners would keep a portion of the amount as payment for services that were falsely described in contracts and invoices and that were never provided. In certain

A-6

instances, Airbus Executive 3 structured overall financial commitments to a single business partner using separate agreements with various business partners.

25.     Airbus Executive 3 maintained internal spreadsheets with annotations that showed the actual and intended recipients of Airbus payments to business partners. Airbus Executive 3 shared these spreadsheets with certain Airbus employees.

26.     SMO International disguised and concealed the true purpose of the engagement of the corrupt business partners in a number of ways, including by creating fake and fraudulent contracts, receiving fake and fraudulent invoices for services that were never performed, creating fake activity reports on behalf of business partners, developing certain "special projects" and investment opportunities that were actually designed as an elaborate and secret way to fund business partners, and by concealing relationships with certain business partners by, among other things, only engaging in oral agreements, using fake non-reimbursable loans, and paying the business partners indirectly.

27.     In or around October 2014, Airbus froze all payments to business partners engaged on sales campaigns for the Commercial Division and subsequently froze payments to all business partners for the Defence & Space and Helicopters Divisions in May 2015. The freeze was in effect when the SMO was formally dissolved by Airbus.

28.     Certain employees and executives at Airbus that did not have an official role within SMO International and/or did not have direct oversight over SMO International's activities were aware of and involved in SMO International's bribery scheme.

29.     For example, Airbus Executive 5, who did not have an official role within or direct oversight over SMO International, personally requested SMO International's assistance in certain sales campaigns where corrupt payments were discussed, had direct contact with certain business

A-7

partners, and took certain acts in furtherance of the corrupt bribery scheme – including sending emails in furtherance of the scheme while located in the United States.

30.     In addition, Airbus Executive 5 and others provided lavish travel and entertainment to foreign officials and discussed business with them while located within the United States, including with executives of Chinese state-owned airlines associated with the China sales campaigns described in further detail below.

*Overview of the China Bribery Scheme*

31.     Chinese Government Entity 1 was a Chinese government agency that oversaw various industries and approved infrastructure projects in China, including projects in the aviation sector.

32.     Chinese Government Entity 2 was a Chinese government agency that supervised aviation in China. Chinese Government Entity 1 participated in the approval of Chinese Government Entity 2's five-year plan for acquiring aircraft for the state-owned and state-controlled airlines in China.

33.     After Chinese Government Entity 2 received approval, in part from Chinese Government Entity 1, to acquire aircraft, it instructed Chinese Government Entity 3, another department of the Chinese government, to negotiate and enter into an agreement referred to as a "General Terms Agreement" to purchase aircraft from airplane manufacturers such as Airbus. A General Terms Agreement included the type and volume of aircraft to be delivered by the airplane manufacturer to the state-owned and state-controlled airlines in China, as well as the delivery dates. During the General Terms Agreement approval process, Chinese Government Entity 1, Chinese Government Entity 2, and Chinese Government Entity 3 were in dialogue with each other. General

A-8

Terms Agreements signed between Airbus and Chinese Government Entity 3 referred to Chinese Government Entity 3 as the commercial representative for the Chinese airlines.

34.      In or about and between 2013 and 2015, Airbus employees and executives, including Airbus Executive 2 and Airbus Executive 5, caused Airbus to engage Consultant 1 to facilitate and conceal bribe payments intended to be paid to Chinese officials in order to obtain or retain business in China, including to obtain and retain General Terms Agreements.

35.      In or about and between 2013 and 2015, Airbus, together with others, including certain executives, employees, and agents, knowingly and willfully conspired to make payments, which it believed were to be used as bribes and which it intended to be used as bribes, in connection with the approval of certain General Terms Agreements in China.

36.      In order to conceal the payments and to conceal its engagement of Consultant 1, Airbus did not pay Consultant 1 directly. Instead, Airbus made payments to a bank account in Hong Kong in the name of a company controlled by Consultant 3, and Consultant 3 then transferred a portion of the money to a bank account controlled by, or for the benefit of, Consultant 1.

37.      The payments were intended, in part, for the purpose of paying bribes for the benefit of foreign officials employed by departments of the Chinese government that approved the General Terms Agreements with Airbus, including Chinese Official 1 and Chinese Official 2, to secure improper advantages and to influence those foreign officials in order for Airbus to obtain and retain business in China, including two General Terms Agreements in 2014.

38.      In addition, in furtherance of the bribery scheme, Airbus, through its employees, executives, and agents, invited executives from certain Chinese state-owned and state-controlled airlines, and occasionally their families, to travel to the territory of the United States to participate

in all expense-paid events, including events held at Park City, Utah, and Maui, Hawaii. Airbus employees, including Airbus Executive 4, Airbus Executive 5, and Airbus Executive 6, and others, traveled to the United States and elsewhere to provide these benefits to the Chinese airline executives, to attend these events with them, and at times, to discuss business opportunities.

39.    For example, executives from certain Chinese state-owned and state-controlled airlines, as well as executives from other airlines, attended an event hosted at a luxury resort in Maui, Hawaii, from 28 July through 2 August 2013 with Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives. The event in Hawaii included golf, scuba diving, snorkeling cruises, horseback riding, ocean kayaking, surfing lessons, and cocktail and luau dinner receptions. A daily half-hour business-related presentation was scheduled in the early mornings, along with side meetings with individual customer airlines, while the rest of the agenda was dedicated to leisure and entertainment activities.

*Details of the China Bribery Scheme[1]*

40.    During 2013, SMO International, on behalf of Airbus, began discussions to engage Consultant 1 in order to assist Airbus with obtaining and negotiating General Terms Agreements in China. Airbus did not retain any executed agreements with Consultant 1 that described the nature, scope, or terms of the agreement with Consultant 1.

41.    Consultant 2 provided the original introduction between Consultant 1 and Airbus. Consultant 2 described Consultant 1 as someone who was retained due "to his long term relationship with the political level . . . and knowing personally some key decision makers of the customer."

---

[1] Some of the communications referenced below have been translated from French into English.

42.     On or about October 22, 2013, Consultant 1 sent an email to Airbus Executive 2, in which he described his interactions with Chinese officials on behalf of Airbus and stated: "I have committed: All payment shall be made subject to mutual acceptable method. It is also our intention is same as yours 'not to cause any embarrassment.'"

43.     Consultant 2 communicated directly with Airbus Executive 5, Airbus Executive 6, Airbus Executive 7 and other Airbus executives responsible for sales of commercial aircraft regarding Airbus Executive 2's communications and interactions with Consultant 1 and Consultant 1's interactions with Chinese officials.

44.     Consultant 1 requested proof of his engagement with Airbus, in the form of a "comfort letter," which would confirm that Consultant 1 would be receiving payments from Airbus that were intended for the Chinese government officials. Consultant 2 notified Airbus executives that Airbus Executive 2 delayed in providing a comfort letter to Consultant 1 and warned that Airbus would suffer consequences as a result, in the form of lower aircraft quantities approved by the Chinese government officials in the upcoming General Terms Agreements.

45.     For example, on or about October 29, 2013, Consultant 2 communicated to Airbus Executive 5 by email that Airbus Executive 2 had a deadline of November 15, 2013 to "firm up with" a "paper" or comfort letter.

46.     Subsequently, on or about November 20, 2013, Consultant 2 sent  an email to Airbus Executive 5, stating that he was "in a difficult position to push for more detailed information," because of what Airbus Executive 2 "did not deliver so far to the contacts . . ."

47.     On or about December 5, 2013, in an email copying Airbus Executive 4, Airbus Executive 5 informed Airbus Executive 2 and Consultant 2: "We need support in China!" Approximately three days later, on or about December 8, 2013, Consultant 2 responded to Airbus

A-11

Executive 5 that Airbus had the opportunity to protect its market share on single-aisle aircraft and obtain dominant market share for wide-body aircraft, and that Airbus Executive 5 was aware of "the associated required resources."

48.    In or around March 2014, SMO International proposed a company affiliated with Consultant 1 for a business partner relationship in China.

49.    At around the same time, as described in the following paragraphs, Consultant 2 communicated with Airbus executives by email that delays in delivering the monetary commitment to Chinese government officials would affect the number of aircraft approved by the Chinese government in the upcoming General Terms Agreement.

50.    On or about March 15, 2014, Consultant 2 wrote to Airbus Executive 6 that the situation would end in "disaster" if Airbus Executive 2 did not take measures. Consultant 2 explained that if nothing happened by March 25, 2014 "there is risk of an impact on General Terms Agreement quantities…"

51.    Prior to Airbus and Chinese Government Entity 3 signing a General Terms Agreement on or about March 26, 2014, Consultant 2 notified Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives on March 25, 2014 that, due to Airbus Executive 2's inaction, the quantity of aircraft proposed by Chinese government officials in the General Terms Agreement would be 50, which was a lower quantity than Airbus had expected. Consultant 2 referred to the lower quantity as a clear "warning" from the Chinese government officials. Consultant 2 explained that Consultant 1 informed Airbus Executive 2 of the reasons for the lower quantity of aircraft.

52.    Thereafter, on March 26, 2014, in advance of the signing of the General Terms Agreement, Consultant 2 notified Airbus Executive 4, Airbus Executive 5, Airbus Executive 6,

A-12

and another Airbus executive that the final quantity of aircraft in the General Terms Agreement would be 70 aircraft, that matters had not been settled with Airbus Executive 2, and that Airbus should not ask for a higher quantity from the Chinese government.

53.     On or about March 26, 2014, Airbus and Chinese Government Entity 3 signed a General Terms Agreement for 70 aircraft, consisting of 43 single-aisle aircraft and 27 wide-body aircraft.

54.     On the same day, on or about March 26, 2014, Consultant 2 emailed Airbus Executive 5 that he was "very frustrated as much as you are. . . . warnings, signals, reactions have been crystal clear and reported every time. . . . At least this time we know perfectly what happened. . . . For this afternoon, the information had been passed to our side clearly."

55.     On or about April 24, 2014, Consultant 2 emailed Airbus Executive 5 about Airbus Executive 2's planned April 29 meeting with Consultant 1 and communicated that when discussions with Airbus Executive 2 "move," Airbus could be assured with a 50% market share, but when such discussions were stuck, the aircraft quantities in the General Terms Agreement would be cut.

56.     On or about April 24, 2014, Airbus Executive 4, Airbus Executive 5, Airbus Executive 6, and other Airbus executives were notified that Chinese Government Entity 2 passed a regulation promoting airlines in China to use wide-body aircraft on domestic flights, which Airbus was promoting in its sales campaigns in China. On or about April 25, 2014, Consultant 2 emailed Airbus Executive 5 that if the "issue (the real issue) with [Airbus Executive 2] is closed or under a serious path of being closed," Consultant 2 would "be able to push stronger this regulation issue" with the Chinese government authorities.

A-13

57.     On or about May 28, 2014, Consultant 2 emailed Airbus Executive 6 that it could be beneficial for Airbus if Airbus Executive 5 were to meet with representatives from the Chinese government agencies involved in the aviation industry, and that Airbus Executive 2 still had "to implement some things" in order for the government officials to be "in positive listening mode."

58.     In or around June 2014, Airbus Executive 5 planned his upcoming visit to China in coordination with Consultant 2, who attempted to arrange meetings between Airbus Executive 5 and Chinese government officials. On or about June 13, 2014, Consultant 2 wrote to Airbus Executive 5 that he had difficulties arranging the meetings because Airbus was unable to secure the "paper," and he wrote: "Consequences: unhappiness. No meetings so far."

59.     On or about June 16, 2014, Consultant 2 emailed Airbus Executive 5 that he was able to secure a private dinner for Airbus Executive 5 with Chinese Official 1 of Chinese Government Entity 1 and Chinese Official 2 of Chinese Government Entity 3. Consultant 2 stated that he was doing the best he could "with empty hands" but that there was "no real thing moving as far as no concrete steps are taken" by SMO International.

60.     On or about June 22, 2014, Consultant 2 emailed Airbus Executive 5 about the aforementioned dinner between Airbus Executive 5 and Chinese Official 1 and Chinese Official 2, stating that no one would be "positive" unless the "document" was kept safely and "flow of concrete evidence starts."

61.     On or about June 24, 2014, Airbus Executive 3 sent an email to a notary in Geneva, Switzerland, stating that he was contacting the notary on recommendation of Airbus Consultant 3.

62.     On or about June 28, 2014, Consultant 2 emailed Airbus Executive 7 regarding Consultant 1's communications with Chinese government officials. Specifically, Consultant 1 reported that Chinese Official 1 had been under "extreme pressure" to have dinner with Airbus

A-14

Executive 5 and to give the clear message to Airbus that the "door" would be "closed until you deliver."

63.     On or about July 2, 2014, Airbus executives, including Airbus Executive 1, Airbus Executive 2, Airbus Executive 3, and others, discussed over email replacing the authorization to engage Consultant 1's company in China with authorization to proceed with Consultant 3's company.

64.     On or about July 9, 2014, Airbus Executive 2 forwarded a text message from Consultant 1 to Airbus Executive 1. In the text message, Consultant 1 wrote that Airbus Executive 4 was received by the government officials at Chinese Government Entity 1 and Chinese Government Entity 2. Consultant 1 cautioned Airbus Executive 2 that "Your people should now understand how our system works . . . it's the first time no package given . . . no matter how much pressure you hv [sic] put on from political and diplomatie [sic] front, its not my nature to see this since we are friends. I want to complete all pending issues with your support ASAP to avoid further head ache for you & me: 1). Deposit the paper; 2). Agreement on normal marketing flow; 3). Details project implementation agreement. We need to complete the above 3 tasks ASAP if [Airbus Executive 4] wants to achieve those he wishes before year end, I think [Airbus Executive 4] rvd the strongest signal from our people during his visit!"

65.     On or about July 21, 2014, the CDSC approved the proposed business partner relationship between Consultant 3's company and Airbus. The agreement with Consultant 3 was purportedly for a separate business arrangement in China, but it was really designed as a means to provide money to Consultant 1.

66.     On the following day, on or about July 22, 2014, Airbus Executive 2 signed a consulting agreement with Consultant 3's company covering the period July 2013 to December

A-15

2014. To support this fake consulting agreement, Consultant 3 subsequently submitted an activity report to Airbus regarding its purported contributions in supporting the separate business arrangement, which Consultant 3 never actually assisted with. Airbus Executive 3 was a custodian of an electronic document that began with wording identical to the wording included in the submitted activity report.

67.     On or about July 23, 2014, Airbus Executive 5 sent an email to Airbus Executive 4 stating that Airbus was facing "difficult political opposition" in "China" and requesting that SMO International inquire into Consultant 3's company for help with campaigns in China. Airbus Executive 5 claimed in the email that he was unaware of Consultant 3's company but that SMO International recommended it. The email was forwarded by Airbus Executive 4 to Airbus Executive 1, confirming the "business requirements" related to Consultant 3.

68.     On or about July 24, 2014, the head of Compliance at Airbus Group emailed Airbus Executive 5, identifying a contradiction in the CDSC's meeting minutes from March 11, 2014: the minutes stated that the request for business partner support in China came directly from Airbus's Commercial Division, whereas Airbus Executive 5 was now stating that he was unaware of Consultant 3's company.

69.     That same day, on or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, sent an email responding to the head of Compliance at Airbus Group and directing him to alter the CDSC meeting minutes referenced above.

70.     That same day, on or about July 24, 2014, Airbus Executive 5, while in the territory of the United States, emailed other Airbus executives and reiterated that changing the CDSC minutes would be "the best way forward."

A-16

71.     On or about July 28, 2014, Airbus paid Consultant 3 10.35 million Euros (approximately 14 million U.S. Dollars) under the business partner agreement related to Airbus's separate business arrangement in China, referenced in paragraphs 65-66 above. The funds were wired by Airbus to Consultant 3's bank account in Hong Kong but were intended for Consultant 1 for his assistance with the General Terms Agreements. SMO International spreadsheets and correspondence indicated that Airbus paid Consultant 1 10.35 million Euros (14 million U.S. Dollars) via a payment to an entity owned by Consultant 3.

72.     On or about August 13, 2014, Consultant 2 emailed Airbus Executive 6, copying Airbus Executive 5, regarding Airbus Executive 5's upcoming meeting with Chinese Official 1 in China in September. Consultant 2 indicated that none of SMO International's commitments have been fulfilled, and that Consultant 2 was risking his credibility.

73.     On or about August 21, 2014, Airbus Executive 7 sent an email to Airbus Executive 4 and Airbus Executive 5 stating that Consultant 1, whom he referred to as Airbus Executive 2's "friend," "didn't get the expected good news" and that "even if first action shows up in next 2/3 weeks . . . it will most probably be urgent also to progress very quickly on the 'document' management."

74.     On or about August 23, 2014, Consultant 2 sent an email to Airbus Executive 7, stating that Consultant 1 had resent his bank details to Airbus Executive 2 and Airbus Executive 3 and was "ballistic" that Airbus Executive 3 had sent Consultant 1 a text that Airbus rejected the "first good news."

75.     On or about August 26, 2014, Consultant 2 emailed Airbus Executive 5 that Chinese Official 1 was considering dinner with Airbus Executive 5 in Beijing but that dinner was "dependent upon the first good news." Subsequently, on or about September 5, 2014, Consultant

A-17

2 notified Airbus Executive 5 that he was able to arrange for him to have dinner with Chinese Official 1 during his upcoming visit to China in September. Consultant 2 warned Airbus Executive 5 that "the discussion will be difficult: still drastic lack of confirmed trust as they want to have the evidence of a stable and smooth implementation of what was committed and after nearly one year and a half of renewed contact."

76.     In or around September 2014, Consultant 1 and Airbus Executive 3 discussed by email how Consultant 1 would be paid for his services. Airbus Executive 3 wrote to Consultant 1 that a Middle Eastern "sending company" would be providing Consultant 1 with a loan and attached a draft loan facility agreement in which another entity owned by Consultant 3 was listed as the lender. Airbus Executive 3 emailed Consultant 1 a draft loan facility agreement for an amount of 7.7 million Euros, which listed Consultant 3's Lebanese company as the lender. The notice provision in the agreement set forth that notices to the lender should be addressed to Consultant 3. According to an email by Airbus Executive 3, the loan facility agreement was intended to "speed up the last delivery."

77.     On or about September 10, 2014, after Consultant 1 indicated to Airbus Executive 3 that he wanted to redraft the loan agreement, Airbus Executive 3 asked if Consultant 1 had a preferred "special & secure number" to use for a telephone conversation. Airbus Executive 3 also wrote "please advise receipt of second batch I boosted to 50% making now 70% total."

78.     On the following day, on or about September 11, 2014, Consultant 2 emailed Airbus Executive 4 and Airbus Executive 5, and subsequently Airbus Executive 7, regarding his discussions with Consultant 1 about outstanding payments from Airbus and the Chinese officials' internal discussions regarding their plans to acquire single-aisle and wide-body aircraft from Airbus. On the basis of his discussion with Consultant 1, Consultant 2 warned that the Chinese

A-18

officials would not move forward in their acquisition of aircraft from Airbus "as far as: 1 – what is due as of today and since January 2013 is done with a minimum of what has been promised (as of tonight only 18% has arrived and for the rest method not acceptable at all) 2- Paper is kept has already organized but process brutally interrupted with no explanation so far."

79.     On the same day, on or about September 11, 2014, Airbus Executive 5 responded to Airbus Executive 4 and Consultant 2 by email that Chinese Official 1 "must stop the sabotage" and that a state-owned Chinese airline was ready to finalize a deal with Airbus for its wide-body aircraft, but Chinese Official 2 "actively discouraged any A330 [wide-body] deals with Airbus." Airbus Executive 5 wrote "This must change. [Chinese Government Entity 1] ([Chinese Official 1]) and [Chinese Government Entity 2] must be actively supportive." In response to Airbus Executive 5's email, Consultant 2 responded that Chinese Official 1 was not the only one blocking Airbus, but that it was a "system" and that Chinese Official 1 and Chinese Official 2 "are the windows." In response, Airbus Executive 5 wrote to Airbus Executive 4 and Consultant 2 "[W]e must 'open the windows.'" Consultant 2 responded to Airbus Executive 4 and Airbus Executive 5, "I gave you some windows and doors . . . we are all and still waiting for the keys . . . after exactly one year and a half." In response, Airbus Executive 5 directed Consultant 2 to call him on his cellular telephone.

80.     In or around late September 2014, Airbus Executive 3 and Consultant 1 exchanged emails on how to "unlock" the "past and on-going" "transaction(s)." Consultant 1 communicated to Airbus Executive 3 that he could not proceed on his current recommendation; Airbus Executive 3 forwarded Consultant 1's email to Airbus Executive 2, stating that he needed a "document" to make further payments to Consultant 1.

81.     At around the same time, the CDSC considered a retrospective engagement of Consultant 1's company, which was ultimately not signed. An internal Airbus document stated that Consultant 1's company would provide broader support for Airbus commercial campaigns in China than Consultant 3's company and that Consultant 1 was a "Chinese businessman who demonstrated in the past his capability to lobby Chinese administration." The document referenced an "expected remuneration" of 18 million U.S. Dollars.

82.     On or about October 11, 2014, Airbus and Chinese Government Entity 3 signed a General Terms Agreement for 70 single-aisle aircraft.

83.     In or around late October 2014, Airbus froze all payments to business partners engaged on sales campaigns for the Commercial Division.

84.     At around the same time, Consultant 1 threatened litigation against Airbus over payments that Consultant 1 claimed Airbus owed him. For example, on or about October 26, 2014, Consultant 1 sent an email to Airbus Executive 2 in which he referenced the "two legal binding document[s]" signed by Airbus Executive 2 on behalf of Airbus and "with full acknowledge of your senior management." Subsequently, when Airbus Executive 7 forwarded Consultant 1's email to Consultant 2 and asked whether he should inform Airbus Executive 5 of the threatened litigation, Consultant 2 advised to wait until a meeting occurred with Consultant 1 in Hong Kong. At around the same time, Airbus Executive 7 discussed with Consultant 2 alternative ways to compensate Consultant 1 for his assistance with the General Terms Agreements, including whether "projects" could be set up in order to compensate Consultant 1.

85.     On or about October 26, 2014, Consultant 1 also emailed Airbus Executive 2 that his agreement with Airbus had not been cancelled and that he did not know whom to communicate with at Airbus. Consultant 1 wrote that he wanted the contact information for Airbus Executive

A-20

2's successor "in order to continue to work and implement based on the platform you built and agreement signed."

86.    On or about November 26, 2014, Consultant 2 sent an email to Airbus Executive 4 and Airbus Executive 5, stating that Chinese Official 2 "is still the window to structure the deals" in China and that Airbus executives could meet with Chinese Official 1's successor in the future. Consultant 2 wrote "On one hand some at the Central such as [Chinese Government Entity 1] are blocking (informally) . . . on the other hand they are still keeping the door slightly open as: 1. Nobody told them it was over 2. They feel very confident firm commitments can be proven anytime 3. They know and agree to play with the new methods scheme a <<positive exit>> from the present situation."

*Travel and Entertainment of Chinese Foreign Officials*

87.    Airbus China and Chinese Government Entity 3 established a Fund ("Fund") in 2011 via a handshake agreement between Airbus Executive 6 and Chinese Official 2. Airbus China made monetary contributions to the Fund; certain Airbus employees expected that, in exchange, Chinese Government Entity 3 would speed up the allocation of aircraft to airlines in China in relation to General Terms Agreements signed that year and the previous year.

88.    The stated purpose of the Fund was to support projects "related to services for the Chinese commercial aviation industry, including but not limited to aviation related management education, seminars, and pilot educational facilities." In reality, the Fund was used, in part, to pay event agencies to host social events for Chinese government officials, including members of Chinese Government Entity 3 and executives of the Chinese airlines.

89.    Under the Fund's governing documents, an appointed Fund committee, composed of members from Airbus China, including Airbus Executive 6, and an official from Chinese

A-21

Government Entity 3, were responsible for administering the Fund as well as evaluating and approving proposed events and projects to be supported by the Fund. Once an event or project was approved, suppliers were engaged to organize the social events. Some of the suppliers were fully or partially owned by Chinese Government Entity 3 or the Chinese airlines.

90.     From 2012 to 2017, the Fund was used to support 13 events and projects, including golf retreats and leisure events that had limited business-related content and fell outside the stated purpose of the Fund. Chinese Official 2 was the originator of at least five of these events.

91.     Airbus Executive 5's approval was sought for six of these events. For example, on or about February 10, 2014, an Airbus employee emailed Airbus Executive 5, copying Airbus Executive 6, and seeking Airbus Executive 5's "final approval" for an "urgent sponsorship." The employee described a golf invitational in China aimed at top level officials of Chinese airlines and stated that the event would be paid for by the Fund. On or about February 14, 2014, Airbus Executive 5, while in the territory of the United States, emailed his approval of the leisure event to Airbus Executive 6 and the Airbus employee who initially sought Airbus Executive 5's approval.

92.     The Fund was also used to fund leisure trips in China, which were attended by executives from Chinese Government Entity 1, Chinese Government Entity 2, Chinese Government Entity 3, certain executives from Chinese state-owned and state-controlled airlines, and several employees of Airbus China.

**Arms Export Control Act and the International Traffic in Arms Regulations**

**Applicable Law**

93.     The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, authorized the President to control, among other things, the export of defense articles deemed critical to the national security and foreign policy interests of the United States. By Executive Order 13637, the President delegated this authority to the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), empowering DDTC to review and grant export licenses for the transfer or retransfer of defense articles and defense services identified on the United States Munitions List ("USML"). DDTC is located in the District of Columbia. Pursuant to its authority under the AECA, DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130, which contained the USML. Accordingly, the export of USML defense articles and defense services is governed by the AECA and ITAR.

94.     Airbus designed, manufactured, and sold certain products containing "defense articles," and furnished certain "defense services," as defined in 22 C.F.R. §§ 120.6 and 120.9, respectively, which were controlled by the AECA and ITAR. Generally, these products were sold by Airbus's Defence & Space and Helicopters divisions. Between on or about December 1, 2011, and continuing through on or about December 1, 2016 ("the relevant ITAR time period"), Airbus violated U.S. law related to the sale of ITAR-controlled defense articles and furnishing of defense services by:

a.      Paying political contributions, fees, and commissions in association with the sale of ITAR-controlled defense articles or defense services and failing to report the same to the DDTC, as required by 22 C.F.R. § 130; and

A-23

b.      Failing to keep records related to the sales of ITAR-controlled defense articles or

defense services for a period of not less than five years, as required by 22 C.F.R.

§ 130.14.

95.     Additionally, during the relevant ITAR time period, Airbus used third-party

business partners, including but not limited to business partners from countries prohibited by 22

C.F.R. § 126, who had failed to register as brokers to assist in sales of ITAR-controlled defense

articles or defense services, in violation of 22 C.F.R. § 129. Airbus's conduct, while not

"knowing[]" or "willful[]," nonetheless, thus "cause[d], aid[ed], abet[ted], . . . or permit[ed]" the

business partners' unauthorized brokering of defense articles or defense services. *See* 22 C.F.R.

§ 127.1(e).

*ITAR Part 130*

96.     Pursuant to the AECA, 22 U.S.C. § 2279, and the ITAR, 22 C.F.R. § 130.9, certain

Applicants (as defined in 22 C.F.R. § 130.2) applying for export licenses were required to inform

DDTC as to whether the Applicant or its Vendors (as defined in 22 C.F.R. § 130.8) had paid,

offered, or agreed to pay political contributions, fees, or commissions in connection with the sale

or transfer of a defense article or defense service. The purpose of this provision was to provide

Executive Branch oversight of the sale of U.S. military technology and prevent "improper

influence" in those sales. H.R. REP. 94-1144, 58, 1976 U.S.C.C.A.N. 1378, 1434. Under these

provisions, for defense articles or defense services valued in an amount of $500,000 or more that

are sold commercially to or for the use of the Armed Forces of a foreign country or international

organization (as defined in 22 C.F.R. § 130.3), an Applicant must report to the DDTC any

payments or agreements to pay (i) political contributions of $5,000 or more, and (ii) fees and

commissions of $100,000 or more. 22 C.F.R. §§ 130.1, 2.

A-24

97.     Further, under 22 C.F.R. § 130.11, all Applicants to the DDTC and their Vendors had an ongoing obligation to correct any false statements or omissions on previous export license applications, including false statements or omissions covered by Part 130.

98.     Additionally, under 22 C.F.R. § 130.14, each Applicant, Supplier (as defined in 22 C.F.R. § 130.7), and Vendor was required to maintain a record of any information it was required to furnish or obtain under Part 130 and all records upon which its reports were based for a period of not less than five years following the date of the report to which they pertained.

*ITAR Part 129*

99.     Pursuant to 22 C.F.R. § 129.3, any person who engaged in brokering activities by taking any action on behalf of another to facilitate the manufacture, export, transfer, re-export, or retransfer of a U.S. or foreign defense article or defense service was required to register with DDTC. Prior to October 25, 2013, ITAR Part 129 and its broker registration requirements applied to all brokers, regardless of their U.S. connection. On October 25, 2013, the regulation was amended to narrow the definition of a "broker" to include: (1) any U.S. person wherever located; (2) any foreign person located in the United States; and (3) any foreign person located outside the United States where the foreign person is owned (more than 50 percent) or controlled by a U.S. person. *See* 78 FR 52690, Aug. 26, 2013. These revisions went into effect on October 25, 2013, and were applicable during the relevant ITAR time period.

100.    In addition, pursuant to 22 C.F.R. § 129.10, any person required to register as a broker was to provide DDTC with an annual report of its brokering activities, identifying the quantity, description, and U.S. dollar value of the defense articles or defense services provided, as well as the type and U.S. dollar value of any consideration received by any person who participated in the brokering activities, and the source thereof.

A-25

101.    Under 22 C.F.R. § 127.1(e), it was unlawful to knowingly or willfully cause, aid, abet, counsel, demand, procure, or permit the commission of any act prohibited by, or the omission of any act required by the AECA, or any regulation, license, approval or order issued thereunder.

*ITAR Part 126.1*

102.    Pursuant to 22 C.F.R. § 126.1, it was the policy of the United States to deny licenses and other approvals for exports and imports of defense articles and defense services, destined for or originating in certain countries (hereinafter, "Prohibited Country" or "Prohibited Countries"). During the relevant ITAR time period, for example, Lebanon,[2] among other countries, was subject to certain prohibitions.

103.    Additionally, 22 C.F.R. § 126.1(e)(1) restricted the sale or transfer of any defense articles or services to certain Prohibited Countries "or any person acting on its behalf" without written approval of the DDTC. It was the policy of the DDTC to deny licenses and approvals involving persons acting on the behalf of certain Prohibited Countries, except as specified in paragraphs (f) through (w) of Section 126.1. Additionally, 22 C.F.R. § 126.1(e)(2) imposed a duty to notify DDTC about any sale or transfer involving certain Prohibited Countries or persons acting on their behalf.

104.    Furthermore, 22 C.F.R. § 129.7 prohibited engaging in brokering activities that involved any country, area, or person referred to in § 126.1 without first obtaining the approval of DDTC. Further, it was the policy of DDTC to deny requests for approval of brokering activities involving certain countries or persons referred to in § 126.1.

---

[2] On December 15, 2006, Lebanon was added as a restricted country to 22 C.F.R. § 126.1, thereby suspending all approvals for licenses to export or otherwise transfer defense articles and defense services to Lebanon, except those authorized by the Government of Lebanon or the United Nations Interim Force in Lebanon (UNIFIL). *See* 71 FR 75609 (Dec. 15, 2006).

## Knowledge of Legal Duties and Willful Conduct

105.    Airbus had knowledge of its requirements under ITAR Part 129 and 130. Airbus's violations of the ITAR, including willful violations of ITAR Part 130, were the result of several factors, including: the Company's ongoing use of business partners in its sales of ITAR-controlled defense articles and defense services; willful efforts and reluctance by certain Company employees to prevent disclosure of business partner relationships and payments; the Company structuring the compliance function as separate and siloed from business sales and the export compliance function, which prevented accurate ITAR compliance; and the Company failing to provide adequate training about ITAR Part 129 and Part 130 for its employees. As a result, with respect to Part 130, Airbus willfully failed to report or under-reported political contributions, fees, and commissions to the DDTC.

106.    Had political contributions, fees, and commissions paid by Airbus (through the SMO or otherwise) been properly reported to the DDTC as part of Airbus's ITAR filings, such disclosure could have triggered oversight by DDTC and other agencies, including in the form of a referral by DDTC to law enforcement. If the DDTC had known that Airbus willfully submitted applications that contained false or incomplete ITAR Part 130 certifications, the DDTC would not have approved the relevant license applications.

107.    Moreover, had Airbus's over one thousand business partners who were used to sell ITAR-controlled defense articles and defense services sought to register as brokers as required by ITAR Part 129, such voluminous use of brokers could have triggered oversight by the DDTC or a referral by DDTC to law enforcement. Thus, Airbus's failure to ensure that its business partners were registered in compliance with ITAR Part 129 further permitted the Company to conduct its operations without sufficient and adequate oversight by DDTC. Additionally, had Airbus's

A-27

business partners from Prohibited Countries attempted to register as brokers, those applications likely would have been denied by DDTC, thereby potentially alerting the Company to the risks of engaging such business partners.

108.     Airbus's relevant conduct occurred in several locations, including but not limited to Airbus's headquarters in France and its subsidiaries in Germany, Spain, and the United States, with the direct involvement, knowledge, and approval of Airbus management personnel.

*Knowledge of ITAR Part 129 and Part 130 Requirements*

109.     Beginning in or around September 2009 and no later than in or around June 2011, Airbus was aware of the ITAR Part 129 and 130 requirements regulating the registration of brokers and the disclosure of political contributions, fees, and commissions paid in connection with sales of defense articles and defense services, as applied to Airbus's business partners. Specifically, in or around September 2009, a memorandum entitled "Part 130 ITAR-U.S. Requirements Under the International Traffic in Arms Regulations for Providing Information on Fees, Commissions, and Contributions" was circulated by a senior compliance employee at the Defence & Space Division, Airbus Export Compliance Employee 1. The memorandum also included on its distribution list a senior executive in the SMO with knowledge of the Company's use of business partners. Further in the fall of 2009, export compliance leadership at Airbus's U.S. subsidiary discussed the application of ITAR Part 130 to non-U.S. persons and retransfer requests, in connection with sales campaigns of the Eurofighter Typhoon aircraft. By April 2010, Airbus senior export compliance staff within the Defence & Space Division, including Airbus Export Compliance Employee 1, discussed the need to establish a procedure to furnish required information regarding political contributions, fees, or commissions to the DDTC. Despite this discussion, no action was taken by the Company to establish a procedure to furnish the requisite information to the DDTC.

A-28

110.    In May 2011, the U.S. Department of State entered into a consent agreement with BAE Systems PLC ("BAE"), regarding BAE's noncompliance with ITAR Parts 129 and 130, and BAE's willful false statements regarding the same (hereinafter "BAE consent agreement"). Following the news of the BAE consent agreement, Airbus discussed its compliance with its obligations under Part 130, and multiple senior-level export compliance officials at Airbus's parent group and within the Defence & Space Division corresponded about the applicability of ITAR Part 130 to various Airbus products, including Eurofighter Typhoon aircraft. For instance, in June 2011, a senior export compliance officer at the French subsidiary stated to the senior export compliance officer at Airbus's parent group that Airbus "cannot escape the obligations created by ITAR" when re-exporting Airbus products to end users other than those originally licensed by the DDTC. In late 2011, an export compliance officer at the French subsidiary wrote an internal memorandum on ITAR Parts 129 and 130, which discussed the requirements of the ITAR, the scope of reporting obligations under Part 130, and how Part 130 applied to intermediaries or brokers.

111.    Subsequently, Airbus discussed ITAR Part 129 and Part 130 compliance with its joint venture partners with whom it manufactured the Eurofighter Typhoon aircraft, showing its awareness of its obligations under the ITAR. In the fall of 2012, one of the joint venture partners specifically told Airbus that DDTC had questioned the joint venture partner about ITAR and whether the other joint venture partners, including Airbus, were complying with Part 130. The joint venture partner also shared with Airbus its own internal policy related to Part 130.

112.    Moreover, in 2013 and 2014, management at Airbus discussed whether ITAR Part 130 filings were required for certain specific sales campaigns, further evidencing Airbus's knowledge of its reporting requirements in the context of actual sales.

A-29

113.    Additionally, Airbus received communications from the DDTC regarding compliance with ITAR Part 130 that further put Airbus on notice of its disclosure obligations. On January 18, 2013, DDTC issued to Airbus an advisory opinion noting the "requirements of the ITAR that are applicable to . . . reporting of political contributions, fees, and commissions under Part 130." The same year, compliance managers at Airbus received and reviewed DDTC's industry-wide guidance on ITAR Part 130 filing requirements. In December 2014, DDTC contacted Airbus's U.S. subsidiary "as a precaution and to prompt thinking at Airbus" about Part 130 disclosures in the context of specific product sales related to border security. Personnel at Airbus's U.S. subsidiary escalated the DDTC's concerns to Airbus colleagues in Germany and France working on the relevant sales campaign.

*Willful Efforts to Conceal Payments to Business Partners from ITAR Disclosure*

114.    Airbus willfully concealed its political contributions, fees, and commissions paid to business partners in conjunction with the sale or transfer of defense articles and defense services. During the relevant ITAR time period, Airbus was paying political contributions, fees, and commissions in coordination with sales campaigns and contracts for Airbus products that contained ITAR-controlled defense articles and defense services. Specifically, the Defence & Space Division, which incorporated ITAR-controlled defense articles within most of its products, used business partners during the relevant ITAR time period. The Helicopters Division, which also had ITAR-controlled defense articles in many of its products and whose customers could choose to add optional ITAR-controlled defense articles to their helicopters, used business partners during the relevant ITAR time period. Some of the business partners used by the Defence & Space Division and Helicopters Division were approved by SMO International, and certain Defence & Space Division and Helicopters Division business partners were managed by SMO International.

A-30

Moreover, several of the SMO International's most frequently used business partners were used on sales of both commercial aircraft and defense articles and defense services. However, Airbus's failure to comply with ITAR Parts 130, 129, and 126.1 occurred regardless of whether the business partner was associated with SMO International.

115.    Airbus willfully obscured from oversight the activity of SMO International, and Airbus more generally, in the payments of political contributions, fees, and commissions to business partners on sales of defense articles and defense services. For instance, as early as June 2011, Airbus Export Compliance Officer 1 stated, "I doubt that we will ever open our books on a business partner" when discussing whether Airbus was required to report business partner payments to a U.S. supplier under ITAR Part 130.

*Failure of Export Compliance Internal Controls*

116.    With knowledge of the ITAR Part 129 and Part 130 requirements, Airbus repeatedly discussed setting internal policies and procedures for ITAR Part 130. As early as June 2013, senior export compliance management at the Defence & Space Division circulated an internal Airbus memorandum that identified risk related to ITAR Part 130 disclosures and recommended an internal policy and procedure addressing compliance with Part 130. Some of the same export compliance management were aware during this time period that Airbus used business partners in sales by the Defence & Space Division. Numerous times over the next few years, senior export compliance management discussed instituting an ITAR Part 130 compliance policy. Nonetheless, Airbus did not adopt any policy on ITAR Part 130 until December 30, 2016, despite the fact that the issues were discussed by senior managers in positions to make changes.

117.    Although Airbus had policies and procedures designed to ensure that the Company complied with the ITAR, Airbus failed to train its employees adequately to ensure that employees

A-31

who certified information as part of ITAR license applications fully complied with Airbus's policies and procedures, and assured compliance with the ITAR, specifically with ITAR Part 130.

*Lack of Oversight of Export Compliance Process*

118.    In and around July 2015, the newly appointed in-house General Counsel at Airbus's parent company identified potential issues with the ITAR Part 130 disclosure framework. In response to these concerns, senior export control officers appeared reluctant to change the company's existing compliance process. Specifically, a senior export compliance executive wrote to the General Counsel that adequate processes and procedures were in place, stating that, regarding DDTC applications: (i) "proper due diligence was done prior to signature" on the application, (ii) templates used "ensure[d]" attention to ITAR Part 130 representations, and (iii) each application was "reviewed carefully to ensure that . . . [it] meets the obligations of Part 130 whether a required statement needs to be included or not." These statements were reviewed by senior export compliance management prior to being made.

119.    In fact, as described further herein, adequate processes and procedures were not in place to ensure compliance with ITAR Part 129 and Part 130 during the relevant ITAR time period, and the aforementioned export compliance management knew the same.

*Part 130 Violations*

120.    ITAR license applications were often signed by export compliance personnel at the relevant Airbus business component (*i.e.*, the Defence & Space Division or Helicopters Division subsidiary in the country of production), although at times they were signed by U.S. export compliance personnel. Export compliance personnel at the business components were generally aware that business partners were used, but they did not personally have access to any business partner agreements and did not know which business partners were associated with which Airbus

A-32

sales campaigns. The Company's export compliance personnel did not personally verify the payments of political contributions, fees, and commissions, and generally did not inquire with sales personnel about the same. Nonetheless, these same export compliance personnel routinely signed certifications on ITAR license applications attesting that no political contributions, fees, and commissions had been paid as a part of the sale and export of the defense articles and defense services for which Airbus was seeking DDTC approval. In fact, a template for ITAR license applications used by Airbus during the relevant ITAR time period had as the standard language that "no political contributions, fees, and commissions had been paid." The template was sent to compliance managers in the United States, Spain, and France for review and comment after its creation in June 2011.

121.    Airbus's U.S.-based export compliance staff filed or assisted in the filing of many of the ITAR license applications. Specifically, the U.S.-based export compliance staff would ensure the proper paperwork was filed, but the representations contained therein regarding the requesting entity, end user, and purpose for the item were furnished by the relevant Airbus business component located outside the United States. U.S.-based export compliance staff performed no independent due diligence outside the certifications provided by their colleagues outside the United States prior to filing ITAR Part 130 disclosures. Moreover, U.S.-based export compliance staff worked in a separate office from the underlying sales teams and did not verify the use of business partners on specific sales campaigns.

*Part 126 and Part 129 Failures*

122.    During the relevant ITAR time period, business partners used by Airbus entities, to include the Defence & Space Division and Helicopters Division, were reviewed and approved by SMO International, and then approved at their respective Divisions. It was not part of the

A-33

Company's approval processes to require the business partners, who were assisting in sales of ITAR-controlled defense articles and defense services, to show proof of registration as brokers with DDTC. During the relevant ITAR time period, business partners were generally used by Airbus for sales of ITAR-controlled products even though Airbus had no knowledge of the business partners' compliance with 22 C.F.R. § 129 and Airbus in fact used business partners who were not registered with the DDTC as required.

123.    Moreover, Airbus had no systems in place to determine whether business partners used by Airbus were from countries with which dealings were restricted under 22 C.F.R. § 126. During the relevant ITAR time period, Airbus used business partners who were citizens of or incorporated in Prohibited Countries listed in ITAR Part 126, including Lebanon, and those business partners were neither registered as brokers with DDTC as required by ITAR Section 129.3 nor licensed by the DDTC to engage in brokering activities under ITAR Section 129.4. Airbus's compliance systems failed to prevent payments to business partners from Prohibited Countries who participated in brokering activities for ITAR-controlled defense articles and defense services.

### ITAR Violations

#### *Voluntary Disclosures*

124.    On November 30, 2016, Airbus sent an initial notification of voluntary disclosure to the DDTC regarding certifications and reports under ITAR Parts 129 and 130.

125.    On July 31, 2017, Airbus sent a detailed voluntary disclosure to the DDTC identifying Part 130 violations related to license applications previously filed with DDTC as well as violations related to ITAR Part 129 and the ITAR's recordkeeping requirements.

126.    Airbus sent supplemental disclosures to DDTC on November 30, 2017, and January 30, 2018. Airbus also filed a report with DDTC on March 1, 2018, wherein it identified corrective

actions it had taken related to ITAR Part 130 compliance. Thereafter, on February 25, 2019, September 20, 2019, and November 3, 2019, Airbus responded to various questions by the DDTC related to its disclosures.

127.    Additionally, on or about September 6, 2017, counsel for Airbus met with the Department of Justice, National Security Division ("NSD"), and provided to NSD the disclosure it made to DDTC on July 31, 2017.

*Willful Violations of Part 130*

128.    Airbus filed numerous license applications during the relevant ITAR time period. Airbus violated ITAR Part 130 by paying political contributions, fees, and commissions on at least forty transactions and failing to properly report the same to the U.S. Department of State, as required. In general, Airbus repeatedly filed license applications with the DDTC stating that ITAR Part 130 did not apply to the application or claiming that no business partner payments were made, and attesting to the accuracy of any ITAR Part 130 disclosures when in fact Airbus did nothing to verify the accuracy of those statements.

129.    Additionally, Airbus routinely failed to adhere to the recordkeeping obligations of 22 C.F.R. § 130.14 for its license applications, which required Airbus to keep records related to the license applications for a period of five years.

*C-295 Exports*

130.    During the relevant ITAR time period, Airbus manufactured C-295 airplanes, which were a twin-turboprop tactical military transport aircraft. Airbus sold C-295 military aircraft to various countries and their Armed Forces. The C-295s sold by Airbus generally included defense articles subject to regulation under the ITAR.

A-35

131.    Airbus's C-295 aircraft were manufactured in Spain by a Defence & Space subsidiary. Certain ITAR-controlled defense articles from U.S. suppliers were component parts of the C-295. When these items were exported from the United States to Spain, the U.S. suppliers were responsible for filing an export license application with the DDTC. Depending on the circumstance, the export license application would list either the Airbus subsidiary in Spain or an identified customer as the end user of the defense article. In instances where Airbus was listed as the end user, Airbus would eventually complete the production of the C-295 and sell it to a later-identified Airbus customer. In those cases, Airbus was responsible for filing a subsequent export license application with the DDTC, informing the DDTC that Airbus's customer would be the new end user for the defense article (hereinafter "re-export license applications"). As part of those re-export license applications, Airbus included statements regarding the applicability of ITAR Part 130 to the re-export (hereinafter "Part 130 certifications" or "certifications"). Airbus repeatedly filed re-export license applications with the DDTC relating to C-295s that included false or incomplete certifications related to ITAR Part 130, as well as re-export license applications that failed to include any certifications about ITAR Part 130.

*Ghana*

132.    Airbus completed two campaigns to sell C-295 aircraft to the Republic of Ghana ("Ghana") in 2009 and 2015, resulting in the sale of three C-295s during this period, two of which were the subject of false ITAR Part 130 certifications and for one of which there was no application filed because the re-export did not meet the requirements of ITAR Part 130. Several Airbus senior executives from Airbus Defence & Space were directly involved in the Ghana sales campaign.

133.    The first contract between Airbus and Ghana was signed on August 3, 2011, selling two C-295s. Airbus delivered the two aircraft on November 17, 2011, and March 19, 2012,

A-36

respectively. Airbus filed ITAR license applications with the DDTC for the transfer of the defense articles in these two C-295s to Ghana under license numbers GC 2715-11 (approved November 30, 2011) and GC 2020-12 (approved August 30, 2012). In those license applications, Airbus stated that the transaction met the requirements of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The applications were signed by export compliance management (Airbus Export Compliance Employee 2) at the Defence & Space Division's Spanish subsidiary.

134.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales in the amount of at least 3,596,523 Euros.

135.    Between 2009 and 2016, Individual 1, a citizen of Ghana, was a high-ranking elected government official in Ghana during the relevant ITAR time period. Beginning in or around 2009, a few months after Individual 1 took office, Individual 1 was in direct and repeated contact with senior Airbus executives from both the Defence & Space Division and SMO International about Airbus sales campaigns. Individual 1 was influential in having the Government of Ghana approve aircraft purchases and Individual 1 contacted Airbus senior executives during the government approval process. In 2011, during Individual 1's time in office, the Ghanaian Parliament approved the purchase of two C-295 aircraft.

136.    In connection with the sales to Ghana, beginning on or about January 1, 2009, the Defence & Space Division's Spanish subsidiary contracted with Individual 1's brother, Consultant 4, a citizen of Ghana and the United Kingdom, to act as a third-party consultant for Airbus during the C-295 sales campaigns. Airbus purposefully sought to engage Consultant 4 due to his closeness to Individual 1, and Airbus management included Consultant 4 in their communications with

A-37

Individual 1. Airbus used Consultant 4 as a conduit for messages intended for Individual 1. Consultant 4 traded on his access to Individual 1.

137.    Consultant 5, a citizen of the United Kingdom, worked in conjunction with Consultant 4 to assist in the sale. Consultant 4 and Consultant 5 initially were engaged by Airbus without any written business partner agreement and without Airbus completing due diligence.

138.    Airbus initially agreed to pay Consultant 4 through a company owned by Consultant 4 and Consultant 5, in excess of 3,500,000 Euros for the Ghana C-295 sales campaign. Airbus worked with Consultant 4 and Consultant 5 for two years before submitting a business partner application to Airbus's compliance staff.

139.    In October 2011, Airbus's compliance staff rejected the proposed contract between Airbus and Consultant 4 and Consultant 5's company because Consultant 4 had a familial relationship to Individual 1. Specifically, Airbus compliance staff found that "the shareholders of this company are so close to the decision makers."

140.    Thereafter, due to the scrutiny of using Consultant 4 as a business partner, senior leadership in SMO International and the Defence & Space Division concocted a plan to deliberately circumvent Airbus's compliance rules. Specifically, the Airbus executives proposed to pay Consultant 4 via Organization 1. Organization 1 was a Spanish-based third-party business partner of Airbus previously used on other Defence & Space campaigns. Organization 1 was in good standing with SMO International. Organization 1 had no prior affiliation with Consultant 4 or Consultant 5. Airbus used Organization 1 solely as a pass-through entity to obscure the involvement and payment of Consultant 4 in sales transactions; Organization 1 did not undertake any third-party business partner activity in Ghana in connection with the 2011 campaign to sell two C-295 aircraft to the Government of Ghana.

A-38

141.   Under this scheme, on March 20, 2012, Airbus entered into a contract with Organization 1 to provide business partner services on the C-295 Ghana campaign. Although the agreement was signed on March 20, 2012, it stated that the effective date for the contract was January 1, 2010. The agreement was signed by Airbus Defence & Space management. The agreement noted that Organization 1's "operational address" was in Ghana, despite the fact that Organization 1 was operating in Spain. Under the agreement, Organization 1 would be provided a success fee for the C-295 aircraft sale. The success fee was calculated to be approximately 3,001,718 Euros, a similar amount to that previously promised to Consultant 4 (3,500,000 Euros).

142.   Pursuant to the agreement, between March 2012 and February 2014, Airbus paid in excess of 3,500,000 Euros to Organization 1 in Spain. The payments on this contract were authorized by SMO International.

143.   Thereafter, Organization 1 transferred money to the account of the company owned by Consultant 4 and Consultant 5. Organization 1 took a percentage of the money prior to the transfer. In total, the company owned by Consultant 4 and Consultant 5 was paid in excess of 1,800,000 Euros in May 2012, related to the 2011 sale of two C-295s. Consultant 4 later claimed 71,393 Euros was still owed to him related to this sale.

144.   In February 2014, Airbus management at SMO International and the Defence & Space Division sought to extend Airbus's contract with Organization 1, related to a subsequent campaign to sell C-295 aircraft to Ghana. Airbus's compliance staff rejected the extension request and required that a new contract be signed. In March 2015, a request was submitted for Organization 1 to be paid 1,665,000 Euros for the 2015 sale of one C-295 aircraft to Ghana. In the request, it was noted that Organization 1 was "involved in previous sellings [sic]," but noted that no contract had been signed with Organization 1.

A-39

145.    Consultant 4 subsequently demanded from both Airbus and Organization 1 payment of 1,675,000 Euros in connection with the 2015 C-295 sale.

146.    Additionally, on or about March 28, 2012, Airbus made political contributions in the amount of 62,200 Euros to a Spanish foundation related to agricultural development in Ghana. This contribution was not initially disclosed on GC 2715-11 or GC 2020-12. Airbus subsequently disclosed the same to the State Department out of abundance of caution, as no direct link between these political contributions and the relevant C-295 sales has been identified to date.

*Indonesia*

147.    In or around 2010 through in or around 2015, Airbus entities attempted to sell C-295 military aircraft to Indonesia, resulting in the sale of eleven C-295s during this period, nine of which were the subject of false ITAR Part 130 certifications. Executives from the Defence & Space Division were directly involved in the sales campaigns. The sales campaign also involved executives from SMO International, including Airbus Executive 3, with respect to engagement of third-party business partners in Indonesia.

148.    The first contract, which involved the sale of nine C-295s, was signed on February 15, 2012. Airbus filed an application with the DDTC for the transfer of the defense articles in these nine C-295s to Indonesia under license numbers GC 2106-12 (approved August 20, 2012), GC 2015-12 (approved September 17, 2012), GC 3713-12 (approved January 28, 2013), GC 3773-13 (approved January 28, 2013), GC 0397-12 (approved March 5, 2013), GC 2218-13 (approved August 23, 2013), GC 3459-13 (approved November 26, 2013), GC 0419-14 (approved March 6, 2014), GC 0221-14 (approved March 14, 2014), and GC 0843-14 (approved April 28, 2014). With one exception (GC 2218-13), Part 130 applied to these applications and in them, Airbus either made no statement regarding 22 C.F.R. § 130, or stated that the transaction met the requirements

A-40

of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The ITAR license applications were signed by Airbus Export Compliance Employee 2, an export compliance manager from the Defence & Space subsidiary in Spain.

149.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales, in the amount of approximately 16,100,000 Euros.

150.    Organization 2 was an Indonesian consultant company. Organization 2's founder claimed to have connections to Indonesia's political leadership. Organization 2 had a highly complex ownership structure, in which shares in the company were owned by groups of shareholders that included holding companies for additional shareholders. Organization 2 employed numerous former Indonesian high-ranking military and government officials.

151.    Organization 2 worked for both Airbus's Commercial and Defence & Space Division in Indonesia. Organization 2 began working for Airbus military aircraft campaigns in and around 2010 on the basis of an oral agreement. Altogether, Airbus paid Organization 2 more than 14,000,000 Euros in connection with military aircraft sales in Indonesia.

152.    Airbus's relationship with Organization 2 was directly overseen by SMO International, including oversight by Airbus Executive 3. Specifically, with respect to Organization 2's engagement on military aircraft campaigns in Indonesia, Airbus Executive 3 reviewed and approved the contracts between Airbus and Organization 2. Airbus approved contracts with Organization 2 despite being told about compliance risks about Organization 2's existence, including that Organization 2's business address listed no sign of the company and that Organization 2's office space appeared partially vacant and generally unused. Organization 2 was

A-41

at times listed among the most frequently used business partners for SMO International. SMO International executives, including Airbus Executives 2 and 3, and executives from the Defence & Space Division met together with representatives from Organization 2 in June 2011 to discuss sales of C-295s to Indonesia.

153.    On February 20, 2012, after the sale of the C-295s to Indonesia was consummated, the Defence & Space Division submitted to Airbus compliance an application for Organization 2 to assist on the sales campaign, which by that time was already completed. On June 15, 2012, the agreement was approved and finalized, in which Airbus agreed to pay Organization 2 in connection with the sale of nine C-295s to the Indonesian Ministry of Defense, for use by the Indonesian Air Force. Airbus paid Organization 2 approximately 4,357,446 Euros under the agreement.

154.    In addition, Airbus promised to pay 11,200,000 Euros to Organization 3 in connection with the same sale. Organization 3 was an Indonesian based-business partner. Airbus entered into two agreements with Organization 3: (i) one on July 3, 2012, the day before the sale was consummated; and (ii) one on July 27, 2012, both in relation to the sale of nine C-295 aircrafts and related technical and administrative support. Airbus's relationship with Organization 3 was also overseen by SMO International.

155.    Airbus paid Organization 3 a total of 9,147,093 Euros in connection with these agreements for the C-295 campaign.

*Vietnam*

156.    In or around 2009 through in or around 2014, Airbus attempted to sell C-295 military aircraft to the country of Vietnam, resulting in the sale of three C-295s during this period, all of which were the subject of false ITAR Part 130 certifications. Senior Airbus executives from

A-42

the Defence & Space Division were directly involved in the Vietnam C-295 sales campaign, and there was some involvement of executives from SMO International.

157.    The aircraft contract between Airbus and the Vietnamese Ministry of Defense was signed on December 17, 2013, selling three C-295s. Airbus filed an ITAR license application with the DDTC for the transfer of the defense articles in these three C-295s to Vietnam, under license number GC 2015-14 (approved August 26, 2014). In that application, Airbus stated that the transaction met the requirements of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The ITAR license application was signed by Airbus Export Compliance Employee 2, an export compliance manager at the Defence & Space subsidiary in Spain.

158.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales, in the amount of 6,150,226 Euros.

159.    Organization 4 was a Hong Kong company doing business in Vietnam. Consultant 6, Consultant 7, and Consultant 8, all foreign nationals, were the controlling partners of Organization 4. Consultant 7 had long-standing personal connections with senior Vietnamese government officials as well as airline executives.

160.    Organization 4 began working for Airbus in or around 2002. Organization 4 commenced work for Airbus on commercial aircraft campaigns based on an oral agreement. Later, between October 2002 and July 2014, Airbus entered into numerous agreements with Organization 4 related to sales campaigns for Airbus commercial, defense, and helicopter products. However, in general, most consultant agreements between Organization 4 and Airbus were entered into retrospectively, following the success of a particular sales campaign.

A-43

161.    Airbus's relationship with Organization 4 was directly overseen by SMO International, including oversight by Airbus Executive 3. Specifically, Airbus Executive 3 reviewed and approved the contracts between Airbus Defence & Space and Organization 4. Consultant 6 was at times listed among the most frequently used business partners for SMO International.

162.    On December 20, 2013, after the sale of the C-295s to Vietnam was consummated, Airbus entered into an agreement by which it agreed to pay Organization 4 a success fee, equivalent to 6,150,226 Euros, in connection with the successful C-295 sales campaigns in Vietnam. Airbus paid at least 2,935,541 Euros under this agreement.

163.    Airbus's gross gain on the sales of the aforementioned C-295s to Ghana, Indonesia, and Vietnam on which Airbus failed to file or falsely filed Part 130 disclosures was approximately $165,208,895.

*Eurofighter*

164.    During the relevant ITAR time period, Airbus manufactured Eurofighter Typhoon aircraft, which were twin-engine fighter jets, together with two partners as part of a joint venture. Eurofighter Typhoon aircraft manufactured by Airbus and its partners generally included defense articles and were subject to regulation under the ITAR.

165.    Eurofighter Typhoon aircraft were manufactured by a joint venture company located in Germany, in which Airbus and two other companies each held shares. Certain ITAR-controlled defense articles from U.S. suppliers were component parts of the Eurofighter Typhoon aircraft.

166.    Pursuant to an agreement between the joint venture member companies, each company was responsible for sales over a geographic region. Under the agreement, the company

A-44

responsible for the sale was responsible for filing the appropriate ITAR license applications with the DDTC. Regarding disclosures under ITAR Part 130, in addition to accounting for its own offers, agreements, or payments of political contributions, fees, or commissions in connection with a sale, the company responsible for the sale was also responsible for gathering information from the other joint venture member companies about any political contributions, fees, or commissions offered, agreed, or paid by those companies.

167.    Under the agreement between the joint venture member companies, Airbus contributed to sales efforts in Austria, among other locations, in support of the joint venture company.

168.    Beginning in or around 2000, Airbus conducted a sales campaign to sell Eurofighter Typhoon aircraft and related services to the Austrian Ministry of Defense, resulting in the eventual sale of fifteen Eurofighter Typhoon aircraft and equipment and services related thereto during this period, all of which contained ITAR-controlled content, and involved false ITAR applications. SMO International managed at least one of the business partners involved in this sale.

169.    The contract between the joint venture company and the Austrian Ministry of Defence was signed in 2003, and later amended in 2007, selling fifteen Eurofighter Typhoon aircraft. Additionally, contracts related to equipment, services, and support of the Eurofighter Typhoon aircraft were signed in 2003, 2007, and 2011. Airbus filed an ITAR license application with the DDTC for the transfer of the defense articles in these fifteen Eurofighter Typhoon aircraft to Austria and the accompanying service agreements, under license number GC 0819-13 (approved May 31, 2013). In GC 0819-13, Airbus made no statements regarding the requirements of 22 C.F.R. § 130.2. GC 0819-13 was signed by senior export compliance management as well as a senior sales manager.

A-45

170.    In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions, as defined in ITAR Part 130, in connection with the sale, in the amount of approximately 55,125,984 Euros.

171.    In total, Airbus made payments to fourteen individuals, consultants, or organizations that should have been reported under Part 130. Of particular note:

a.      Consultant 9 was a consultant in Austria, hired by Airbus in connection with the Eurofighter Typhoon Austrian sales campaign. Between April 2002 and December 2009, Airbus paid 16,895,467 Euros to Consultant 9, plus a success fee equivalent to 2,750,000 Euros.

b.      Organization 5 was an Austrian company whose principal held a close familial connection to an Austrian government official. Both the principal and the Austrian government official were good friends of Consultant 9. On behalf of Airbus, Consultant 9 paid 87,600 Euros to Organization 5 for the development of an airshow.

c.      Organization 6 was an Austrian company and a third-party business partner of Airbus. In 2011, pursuant to a consultant agreement, Airbus paid 3,097,226 Euros to Organization 6 in connection with the Austria Eurofighter campaign. Airbus's relationship with Organization 6 was directly overseen by SMO International.

*Part 129 Non-Compliance*

172.    During the relevant ITAR time period, Airbus employed the services of hundreds of third-party business partners to facilitate the manufacture, export, permanent import, transfer, re-export, or retransfer of aircraft and other platforms that contained ITAR-controlled defense articles. The business partners engaged in brokering activities while receiving fees and

A-46

commissions from Airbus that were not disclosed in brokering reports, as required under ITAR Section 129.10.

173.    As previously described, between December 1, 2011, and October 24, 2013, the ITAR required business partners who engaged in brokering activities involving ITAR-controlled defense articles or defense services to register with DDTC. Between October 25, 2013, and December 1, 2016, the ITAR required business partners with a U.S. nexus engaged in sales of ITAR-controlled defense articles and defense services to register with the DDTC. A number of Airbus's business partners failed to register as brokers as required by ITAR Part 129.

174.    Despite these requirements, Airbus did not have an adequate process in place to ensure that its business partners that engaged in sales of ITAR-controlled defense articles and defense services were registered as brokers with the DDTC and filed reports with the DDTC. Airbus also failed to confirm whether these business partners were properly registered with DDTC prior to engaging or paying these business partners to work on sales campaigns involving ITAR-controlled products or services. Airbus nonetheless paid these brokers to facilitate sales of ITAR-controlled defense articles and defense services. As such, Airbus's conduct, while not "knowing[]" or "willful[]", nonetheless, thus "cause[d], aid[ed], abet[ted], . . . or permit[ed]" the business partners' unauthorized brokering of defense articles or defense services. *See* 22 C.F.R. § 127.1(e).

175.    Consultant 10 was a Thai national, whom Airbus hired as a business partner to work on campaigns to sell Airbus products, including products containing ITAR-controlled defense articles and defense services, to the Government of Thailand and various Thai Armed Forces. Consultant 10 was specifically identified by Airbus Executive 3 as an appropriate business partner for Thailand because of his connections to Thai government officials. Consultant 10 was

designated by SMO International as one of its most frequently used business partners. Airbus's relationship with Consultant 10 was managed by SMO International.

176.    Consultant 10 was not registered as a broker with the DDTC between 2008 and October 25, 2013. Airbus did not screen Consultant 10 to ensure compliance with 22 C.F.R. § 129.2, .3, & .10, or require Consultant 10 to show proof of broker registration with the DDTC.

177.    Between 2008 and October 25, 2013, Consultant 10 worked for Airbus on various campaigns to sell Airbus helicopters to various Thai government entities, to include the Royal Thai Army, Royal Thai Navy, Royal Thai Air Force, Royal Thai Police, and Royal Thai Survey Department. Many of these campaigns were for sales of Airbus helicopters that may have included ITAR-controlled products, to include the EC120, EC155, EC725, AS365, and AS550 models. During the relevant time period, at least approximately 28,595,000 Euros was promised or paid in relation to sales between 2008 and October 25, 2013 (*i.e.*, the time period in which registration was required) of Airbus products that may have contained ITAR-controlled parts or technology. Airbus paid Consultant 10 approximately 9,645,735 Euros for his brokering services in connection with helicopter and defense campaigns. Airbus's payments to Consultant 10 facilitated Consultant 10's violation of ITAR Part 129.

*Part 129.7 and 126.1 Non-Compliance*

178.    Airbus also failed to implement policies and procedures to ensure that no business partners who engaged in brokering activity on its behalf were nationals of or incorporated in countries listed in ITAR Part 126.1, which prohibits the sale of defense articles and defense services to any listed Prohibited Country or a person from any listed Prohibited Country acting on its behalf without written approval of the DDTC. During the relevant ITAR time period, Airbus employed a number of business partners from Prohibited Countries listed in Part 126 who engaged

A-48

in brokering activities to export or re-export defense articles or defense services. These business partners did not obtain written approval from the DDTC for their brokering activities, and if they had sought approval, it was the policy of the DDTC to deny brokering licenses to brokers from certain Prohibited Countries, pursuant to 22 C.F.R. § 129.7. Moreover, Airbus failed to notify DDTC about any sale or transfer involving Prohibited Countries or persons from Prohibited Countries, as required by 22 C.F.R. § 126.1(e)(2).

179.    At all times during the relevant ITAR time period, Lebanon was a Prohibited Country listed in ITAR Part 126.1.

180.    Consultant 11 was a Lebanese national, whom Airbus used as a business partner from 1996 to 2016. Consultant 11 did business using various corporate entities, most of which were incorporated in Lebanon and had Lebanese addresses. Consultant 11 did business using bank accounts located in Lebanon. Consultant 11 was approved by Airbus for work as a business partner on Commercial and Helicopter Division sales in Kuwait, despite Consultant 11's Lebanese connection and Airbus's awareness thereof.

181.    Consultant 11 was used by Airbus in part due to his connections with Kuwaiti government officials, including former and current members of the Kuwaiti Government.

182.    SMO International managed Airbus's relationship with Consultant 11. Beyond the contracts approved by Airbus for commercial transactions, Airbus Executive 3 provided Consultant 11 with side "comfort letters" promising Consultant 11 compensation above and beyond what had been approved by Airbus. Airbus also invested in joint venture corporations with Consultant 11.

A-49

183.    For his services as a business partner Airbus paid Consultant 11 approximately 860,000 Euros in connection with Airbus Helicopter campaigns that may have contained ITAR-controlled products. Airbus made these payments to a bank account located in Lebanon.

184.    Airbus's use of Consultant 11 as a broker for ITAR-controlled products was in violation of 22 C.F.R. § 126.1 and 129.7. During the relevant ITAR time period, Airbus failed to report its use of Consultant 11's brokering services, as required by 22 C.F.R. § 126.1(e)(2) and 129.7. Further, Consultant 11 was not registered as a broker with DDTC as required by 22 C.F.R. § 129. Airbus failed to screen Consultant 11 to ensure his compliance with 22 C.F.R. § 129.

185.    Consultant 12 was a French national, whom Airbus used as a business partner during the relevant ITAR time period. Consultant 12 did business using a corporate entity, which was incorporated in Lebanon and carried a Lebanese address. Consultant 12 did business using a bank located in Lebanon. Consultant 12 was approved by Airbus for work as a business partner on Commercial, Defence & Space, and Helicopter Division sales in various countries, including Defence & Space and Helicopter sales in Croatia, Czech Republic, Kuwait, and Turkmenistan, despite Consultant 12's Lebanese connection and Airbus's awareness thereof.

186.    For his services as a business partner, including services as a broker of ITAR-controlled products, Airbus paid Consultant 12 approximately 1,400,000 Euros. Airbus made these payments to a bank account located in Lebanon.

187.    Airbus's use of Consultant 12 as a broker for ITAR-controlled products was in violation of 22 C.F.R. § 126.1 and 129.7. During the relevant ITAR time period, Airbus failed to report its use of Consultant 12's brokering services, as required by 22 C.F.R. § 126.1(e)(2). Further, Consultant 12 was not registered as a broker with DDTC as required by 22 C.F.R. § 129. Airbus failed to screen Consultant 12 to ensure his compliance with 22 C.F.R. § 129.

A-50

188.    Consultant 13 was a Lebanese national who served as a director of a company based in the United Arab Emirates ("UAE") that Airbus used as a business partner during the relevant ITAR time period.

189.    Consultant 13 was approved by Airbus for work as a business partner on Defence & Space Division sales in the UAE, despite Consultant 13's Lebanese connection and Airbus's awareness of thereof. Specifically, during the relevant ITAR time period, Consultant 13 provided brokering services on behalf of Airbus in connection with the sale of ITAR-controlled satellite technology and services to the UAE Armed Forces.

190.    For his services as a broker of ITAR-controlled products, Airbus paid Consultant 13 approximately 820,000 Euros.

191.    Airbus's use of Consultant 13 as a broker for ITAR-controlled products was in violation of 22 C.F.R. § 126.1 and 129.7. During the relevant ITAR time period, Airbus failed to report its use of Consultant 13's brokering services, as required by 22 C.F.R. § 126.1(e)(2). Further, Consultant 13 was not registered as a broker with DDTC as required by 22 C.F.R. § 129. Airbus failed to screen Consultant 13 to ensure his compliance with 22 C.F.R. § 129.

**ATTACHMENT B**

**Extraordinary Board of Directors meeting to be held on 24 January 2020**

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Airbus SE (the "Company") has been engaged in discussions with the French Parquet National Financier (the "PNF"), the U.K. Serious Fraud Office (the "SFO"), the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Department of Justice, National Security Division (the "NSD") and the United States Attorney's Office for the District of Columbia, Criminal Division (the "Office") regarding issues arising in relation to certain improper payments to foreign officials to facilitate the award of contracts and assist in obtaining business for the Company; and

WHEREAS, the Company has been engaged in discussions with the Fraud Section, the NSD, the Office, and United States Department of State ("DOS") regarding the reporting of fees, commissions and political contributions in connection with authorisations for transfers under the International Traffic in Arms Regulations ("ITAR"), associated brokering as defined in the ITAR, and unauthorised transfers under the ITAR;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into certain agreements with the PNF, SFO, Fraud Section, NSD, the Office and DOS, as described below; and

WHEREAS, the Company's General Counsel, John Harrison, together with outside counsel for the Company, have advised the Board of Directors of the Company (the "Board") of its rights, possible defenses, the United States Federal Sentencing Guidelines' provisions and the consequences of entering into such agreements with the PNF, SFO, Fraud Section, NSD, the Office and DOS;

Therefore, the Board has RESOLVED that:

*Deferred Prosecution Agreements and Consent Agreement*

1.  The Deferred Prosecution Agreements, being (i) a Convention Judiciaire d'Intérêt Public with the PNF, (ii) a Deferred Prosecution Agreement with the SFO, and (iii) a Deferred Prosecution Agreement with the the Fraud Section, NSD, and the Office (together: the "DPAs"), and (iv) a Consent Agreement with DOS, substantially in the form, and with the monetary penalties (including disgorgement and forfeiture amounts), presented to the Board, and the performance by the Company of any act contemplated thereby or ancillary thereto are approved[i].

2.  To the extent that any act was performed by the Company relating to any matter contemplated by or ancillary to any of the DPAs, the Consent Agreement and/or the foregoing resolution, such act is approved, confirmed and ratified in all respects.

3.  The Company's Chief Executive Officer, the Company's Chief Financial Officer or the Company's General Counsel are authorised, empowered and directed on behalf of the Company, individually, each with the right of substitution, to finalise and execute the DPAs, the Consent Agreement and such other documentation as any of them deems necessary or appropriate and to take or cause to be taken all such further actions as in their judgment are necessary, appropriate or advisable in order to execute and carry out fully the intent and purposes of the DPAs, the Consent Agreement and the foregoing resolutions, in each case with such changes to the DPAs and Consent Agreement as the Company's Chief Executive Officer, the Company's Chief Financial Officer or the Company's General Counsel may approve.

4.   The Company grants a power of attorney to each authorised officer referred to in the previous resolution, and to any person to whom an authorised officer delegates such power of attorney, to perform on the Company's behalf any act by the Company relating to the DPAs and Consent Agreement; the relationship under such power of attorney is governed exclusively by the laws of the Netherlands.

JOHN HARRISON

Date: 24 January 2020
By: _____
Corporate Secretary
Airbus SE

---

[i] In particular with respect to the DPA to be concluded with the Fraud Section, NSD and the Office (the "US DPA"):

i.   the Company (a) acknowledges the filing of the two-count Information charging the Company one count of conspiracy to commit offenses against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, Title 15, United States Code, Section 78dd-3; and one count of conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371, that is, to violate the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130; (b) waives indictment on such charges and shall enter into the US DPA; (c) agrees to accept a monetary penalty against the Company that will be paid to the United States Treasury within 10 business days, and its ownership of an identified bond will be transferred to the United States as a civil forfeiture within 10 business days, or as otherwise directed by the Fraud Section, NSD and the Office, with offsets to the total penalty resulting from amounts paid to PNF in connection with their resolution relating to the same conduct and to the DOS in connection with their Consent Agreement relating to ITAR violations; and (d) agrees to pay such criminal penalty to the United States with respect to the conduct described in the aforementioned Information; and

ii.  the Company accepts the terms and conditions of the US DPA, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the US DPA and any charges by the United States arising out of the conduct described in the Statement of Facts (being Attachment A to the US DPA) of any objection with respect to venue and consents to the filing of the Information referred to in paragraph (i) above, as provided under the terms of the US DPA, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the aforementioned Statement of Facts or relating to conduct known to the Fraud Section, NSD, and the Office prior to the date of signing of the US DPA that is not time-barred by the applicable statute of limitations on the date of the signing of the US DPA.

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.,* the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and its implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130, and other applicable anti-corruption and export control laws, Airbus SE (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of internal accounting controls designed to ensure the making and keeping of fair and accurate books, records and accounts; (b) a rigorous anti-corruption compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of the FCPA and other applicable anti-corruption laws; and (c) a rigorous export control compliance program that incorporates relevant internal accounting controls, as well as policies and procedures designed to effectively detect and deter violations of AECA, the ITAR, and other applicable laws regarding the sale and export of U.S.-controlled defense articles. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies and procedures:

C-1

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the anti-corruption and export control laws and its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the FCPA and other applicable foreign law counterparts (collectively, the "anti-corruption laws,") and AECA, the ITAR, and other applicable export control laws (collectively, the "export control laws"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the anti-corruption laws, the export control laws, and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the anti-corruption laws and the export control laws by personnel at all levels of the Company.  These anti-corruption and export compliance policies and procedures shall apply to all directors, officers and employees and, where necessary and appropriate, outside parties acting on behalf of the Company in a foreign jurisdiction, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.  Such policies and procedures shall address, among other topics:

C-2

a.    gifts;

b.    hospitality, entertainment, and expenses;

c.    customer travel;

d.    political contributions;

e.    charitable donations and sponsorships;

f.    facilitation payments;

g.    solicitation and extortion;

h.    ITAR registration requirements;

i.    ITAR notification requirements; and

j.    ITAR prohibited countries.

4.    The Company will ensure that it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records and accounts. This system should be designed to provide reasonable assurances that:

a.    transactions are executed in accordance with management's general or specific authorization;

b.    transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

c.    access to assets is permitted only in accordance with management's general or specific authorization; and

d.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

C-3

*Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the foreign bribery and export control risks facing the Company, including, but not limited to, its geographical organization, interactions with various types and levels of government officials, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, degree of governmental oversight and inspection, and volume and importance of goods and personnel clearing through customs and immigration.

6.      The Company shall review its anti-corruption and export compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

*Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's anti-corruption compliance and export compliance code, policies, and procedures.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

C-4

*Training and Guidance*

8.     The Company will implement mechanisms designed to ensure that its anti-corruption and export compliance code, policies, and procedures are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, legal, compliance, finance), or positions that otherwise pose a corruption or export control risk to the Company, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees and, where necessary and appropriate, agents and business partners, on complying with the Company's anti-corruption and export control compliance code, policies and procedures, including when they need advice on an urgent basis or in any foreign jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.    The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees and, where appropriate, agents and business partners concerning violations of the anti-corruption and export control laws or the Company's anti-corruption and export control compliance code, policies and procedures.

11.    The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating and documenting allegations of

C-5

violations of the anti-corruption or export control laws or the Company's anti-corruption or export control compliance code, policies, and procedures.

*Enforcement and Discipline*

12.    The Company will implement mechanisms designed to effectively enforce its compliance code, policies and procedures, including appropriately incentivizing compliance and disciplining violations.

13.    The Company will institute appropriate disciplinary procedures to address, among other things, violations of anti-corruption and export control laws and the Company's anti-corruption and export control compliance codes, policies, and procedures by the Company's directors, officers and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies and procedures and making modifications necessary to ensure the overall anti-corruption and export control compliance programs are effective.

*Third-Party Relationships*

14.    The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.    properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

C-6

b.      informing agents and business partners of the Company's commitment to abiding by anti-corruption and export control laws, and of the Company's anti-corruption and export control compliance codes, policies, and procedures; and

c.      seeking a reciprocal commitment from agents and business partners.

15.      Where necessary and appropriate, the Company will include standard provisions in agreements, contracts and renewals thereof with all agents and business partners that are reasonably calculated to prevent violations of anti-corruption and export control laws, which may, depending upon the circumstances, include: (a) anti-corruption and export control representations, and undertakings relating to compliance with anti-corruption and export control laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the anti-corruption and export control laws, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

*Mergers and Acquisitions*

16.      The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate FCPA and anti-corruption, as well as export control due diligence by legal, accounting, and compliance personnel.

17.      The Company will ensure that the Company's compliance codes, policies, and procedures regarding the anti-corruption and export control laws apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.      train the directors, officers, employees, agents, and business partners consistent with Paragraph 8 above on the anti-corruption and export control laws and the Company's compliance code, policies, and procedures regarding anti-corruption laws; and

b.      where warranted, conduct an FCPA, and AECA and ITAR, specific audit of all newly acquired or merged businesses as quickly as practicable.

*Monitoring and Testing*

18.      The Company will conduct periodic reviews and testing of its anti-corruption and export control compliance codes, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of anti-corruption and export control laws, and the Company's anti-corruption and export control codes, policies and procedures, taking into account relevant developments in the field and evolving international and industry standards.

**ATTACHMENT D**

**REPORTING REQUIREMENTS**

Airbus SE (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section, the United States Department of Justice, National Security Division, and the United States Attorney's Office for the District of Columbia, Criminal Division (the "Fraud Section, NSD, and the Office") periodically, at no less than approximately twelve-month intervals during the term of this Agreement, regarding remediation and implementation of the compliance program and internal controls, policies and procedures described in Attachment C. During the term of this Agreement, the Company shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

a.      By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section, NSD, and the Office a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve the Company's internal controls, policies and procedures for ensuring compliance with the FCPA, AECA and ITAR, and other applicable anti-corruption and export control laws, and the proposed scope of the subsequent reviews. The report shall be transmitted to Christopher Cestaro, Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 1400 New York Ave NW, Washington, DC 20005; Elizabeth L. D. Cannon, Deputy Chief, Counterintelligence and Export Control Section, National Security Division, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Suite 7700 Washington, DC 20530; as well as Gregg Maisel, Chief, National Security Section, and Michelle Zamarin, Deputy Chief, Fraud and Public Corruption Section, United States Attorney's Office for the District of Columbia, 555 Fourth Street NW, Washington, D.C., 20530. The Company

D-1

may extend the time period for issuance of the report with prior written approval of the Fraud Section, NSD, and the Office.

      b.     The Company shall undertake at least two follow-up reviews and reports, incorporating the Fraud Section, NSD, and the Office's views on the Company's prior reviews and reports, to further monitor and assess whether the Company's policies and procedures are reasonably designed to detect and prevent violations of the FCPA, AECA and ITAR, and other applicable anti-corruption and export control laws.

      c.     The first follow-up review and report shall be completed and delivered to the Fraud Section, NSD, and the Office by no later than one year after the initial report is submitted and delivered to the Fraud Section, NSD, and the Office. The second follow-up review and report shall be completed and delivered to the Fraud Section, NSD, and the Office no later than thirty (30) days before the end of the Term.

      d.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section, NSD, and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section's, NSD's, and the Office's discharge of their duties and responsibilities or is otherwise required by law.

      e.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section, NSD, and the Office.

ATTACHMENT E

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| **50,000,000 EURO BOND BELONGING** | ) | |
| **TO AIRBUS SE** | ) | |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

**COMES NOW**, plaintiff the United States of America (the "Government"), by and through

the United States Attorney for the District of Columbia, pursuant to Title 18, United States Code,

Section 981(a)(1)(C) to bring this verified complaint for forfeiture in a civil action *in rem* against

one 50,000,000 Euro bond belonging to Airbus SE ("Defendant Property").

## NATURE OF ACTION AND THE DEFENDANT *IN REM*

1.     This civil action *in rem* is brought against the Defendant Property to forfeit it to the

United States as authorized by 18 U.S.C. § 981(a)(1)(C). Airbus SE transferred its property interest

in the Defendant Property to the United States in conjunction with a Deferred Prosecution

Agreement (DPA) entered into by the United States and Airbus SE.

2.     By this Complaint, the United States seeks forfeiture of all right, title, and interest

in the Defendant Property, which Airbus SE has agreed is forfeitable to the United States as a result

of its violations of the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 et seq., and its

implementing regulations, the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R.

§ 130.9.

3.      Airbus SE has agreed that the facts contained in the related Information and Statement of Facts filed with the DPA are sufficient to establish that this Defendant Property is subject to civil forfeiture to the United States.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345, 1355.

5.      Venue is proper within this judicial district pursuant to 28 U.S.C. §§ 1355(b), 1395(b) because acts or omissions which gave rise to the forfeiture occurred in this district.

## FACTS GIVING RISE TO FORFEITURE

### Background

6.      Airbus SE was a publicly traded company on the Euro Stoxx 50 market with headquarters in Leiden, Netherlands. Airbus SE's main office was in Toulouse, France. Airbus SE was a holding company that operated worldwide through its subsidiaries and affiliated entities, including subsidiaries and affiliated entities that were located in the United States (collectively "Airbus" or the "Company"). Airbus had approximately 136,000 employees.

7.      Airbus was founded in 2000 as the European Aeronautic Defence & Space Company NV ("EADS NV"). In or about January 2014, EADS NV changed its name to Airbus Group NV, and Airbus Group NV became the parent company. In or about May 2015, Airbus Group NV changed its name to Airbus Group SE, and Airbus Group SE became the parent company. In or about April 2017, Airbus Group SE changed its name to Airbus SE, and the defendant Airbus SE became the parent company. Airbus SE is the lawful successor-in-interest to EADS NV, Airbus Group NV, and Airbus Group SE.

E-2

8.      During the relevant period, Airbus's business was organized into divisions. The structure changed and was progressively simplified over the period, but there were broadly three divisions: (i) the Commercial Division, which handled, among other things, the manufacture and sale of civilian aircraft to airlines; (ii) the Defence & Space Division, which handled, among other things, the manufacture and sale of military aircraft, satellites, unmanned aerial systems, and other products and services used by governmental agencies; and (iii) the Helicopters Division, which handled the manufacture and sale of helicopters and related equipment and services.

9.      As set out in more detail in the Statement of Facts, attached as Exhibit A and incorporated herein by reference, the AECA authorized the President to control, among other things, the export of defense articles deemed critical to the national security and foreign policy interests of the United States. By Executive Order 13637, the President delegated this authority to the United States Department of State, Directorate of Defense Trade Controls ("DDTC"), empowering DDTC to review and grant export licenses for the transfer or retransfer of defense articles and defense services identified on the United States Munitions List ("USML"). DDTC is located in the District of Columbia. Pursuant to its authority under AECA, DDTC promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120-130, which contained the USML. Accordingly, the export of USML defense articles and defense services is governed by the AECA and ITAR.

10.     Airbus designed, manufactured, and sold certain products containing "defense articles" and furnished certain "defense services," as defined in 22 C.F.R. § 120.6 and 120.9, respectively, which were controlled by the AECA and ITAR. Generally, these products were sold by Airbus's Defence & Space and Helicopters Divisions. Between on or about December 1, 2011, and continuing through on or about December 1, 2016 ("the relevant ITAR time period"), Airbus violated U.S. law related to the sale of ITAR controlled defense articles and furnishing of defense

services by:

     a.     Paying political contributions, fees, and commissions in association with the sale of ITAR-controlled defense articles or defense services and failing to report the same to the DDTC, as required by 22 C.F.R. § 130; and

     b.     Failing to keep records related to the sales of ITAR-controlled defense articles or defense services for a period of not less than five years, as required by 22 C.F.R. § 130.14.

     11.     Pursuant to the AECA, 22 U.S.C. § 2279, and the ITAR, 22 C.F.R. § 130.9, certain Applicants (as defined in 22 C.F.R. § 130.2) applying for export licenses were required to inform DDTC as to whether the Applicant or its Vendors (as defined in 22 C.F.R. § 130.8) had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale or transfer of a defense article or defense service. The purpose of this provision was to provide Executive Branch oversight of the sale of U.S. military technology and prevent "improper influence" in those sales. H.R. REP. 94-1144, 58, 1976 U.S.C.C.A.N. 1378, 1434. Under these provisions, for defense articles or defense services valued in an amount of $500,000 or more that are sold commercially to or for the use of the Armed Forces of a foreign country or international organization (as defined in 22 C.F.R. § 130.3), an Applicant must report to the DDTC any payments or agreements to pay (i) political contributions of $5,000 or more, and (ii) fees and commissions of $100,000 or more. 22 C.F.R. § 130.1, 2.

     12.     Airbus had knowledge of its requirements of ITAR Part 130. Airbus's willful violations of ITAR Part 130, were the result of several factors, including: Airbus's ongoing use of business partners in its sales of ITAR-controlled defense articles and defense services; willful efforts and reluctance by certain Airbus employees to prevent disclosure of the business partner

relationships and payments; Airbus structuring the compliance function as separate and siloed from business sales, and the export compliance function, which prevented accurate ITAR compliance; and Airbus failing to provide adequate training about ITAR Part 130 for its employees. As a result, with respect to Part 130, Airbus willfully failed to report or under-reported political contributions, fees, and commissions to the DDTC.

13.     Had political contributions, commissions, and fees paid by Airbus been properly reported to the DDTC as part of Airbus's ITAR filings, such disclosure could have triggered oversight by DDTC and other agencies, including in the form of a referral by DDTC to law enforcement.

14.     If the DDTC knew that Airbus willfully submitted applications that contained inaccurate or incomplete ITAR Part 130 certifications, the DDTC would not have approved the relevant license applications.

Vietnam Conduct

15.     In or around 2009 through in or around 2014, Airbus attempted to sell C-295 military aircraft to the country of Vietnam, resulting in the sale of three C-295s during this period, all of which were the subject of false ITAR Part 130 certifications. Senior Airbus executives from the Defence & Space Division were directly involved in the Vietnam C-295 sales campaign and there was some involvement of executives from SMO International.

16.     The aircraft contract between Airbus and the Vietnamese Ministry of Defense was signed on December 17, 2013, selling three C-295s. Airbus filed an ITAR license application with the DDTC for the transfer of the defense articles in these three C-295s to Vietnam, under license number GC 2015-14 (approved August 26, 2014). In that application, Airbus stated that the transaction met the requirements of 22 C.F.R. § 130.2 and asserted that Airbus and its Vendors had

not paid, offered, or agreed to pay political contributions, fees, or commissions in connection with the sale. The ITAR license application was signed by Airbus Export Compliance Employee 2, an export compliance manager at the Defence & Space subsidiary in Spain.

17.     In fact, Airbus or its Vendors had paid, offered, or agreed to pay political contributions, fees, or commissions in connection with these sales, in the amount of 6,150,226 Euros.

18.     Organization 4 was a Hong Kong company doing business in Vietnam. Consultant 6, Consultant 7, and Consultant 8, all foreign nationals, were the controlling partners of Organization 4. Consultant 7 had long-standing personal connections with senior Vietnamese government officials as well as airline executives.

19.     Organization 4 began working for Airbus in or around 2002. Organization 4 commenced work for Airbus on commercial aircraft campaigns based on an oral agreement. Later, between October 2002 and July 2014, Airbus entered into numerous agreements with Organization 4 related to sales campaigns for Airbus commercial, defense, and helicopter products. However, in general, most consultant agreements between Organization 4 and Airbus were entered into retrospectively, following the success of a particular sales campaign.

20.     Airbus's relationship with Organization 4 was directly overseen by SMO International, including oversight by Airbus Executive 3. Specifically, Airbus Executive 3 reviewed and approved the contracts between Airbus Defence & Space and Organization 4. Consultant 6 was at times listed among the most-frequently used business partners for SMO International.

21.     On December 20, 2013, after the sale of the C-295s to Vietnam was consummated, Airbus entered into an agreement by which it agreed to pay Organization 4 a success fee, equivalent to 6,150,226 Euros, in connection with the successful C-295 sales campaigns in Vietnam. Airbus paid at least 2,935,541 Euros under this agreement.

E-6

Tracing of Defendant Property

22.     The proceeds of the 2013 C-295 sale to Vietnam are traced as follows:

a.      Airbus's first date of receipt for the aircraft sale was on April 14, 2014 for 30,751,146

Euros. Airbus's last date of receipt for the aircraft sale was on May 17, 2015 for

14,833,837 Euros. Airbus received various interim payments between the first and

last date of receipt to exceed 50,000,000 Euros in amount paid.

b.      The payments were made to an Airbus Defence & Space, Spain ("Airbus D&S

Spain") EUR bank account.

c.      The Airbus D&S Spain EUR bank account was then swept as part of a zero balance

automatic cash pooling policy into an Airbus SE EUR pooling account. Funds from

other Airbus group entities were also paid into this pooling account.

d.      This Airbus SE EUR pooling account was then used for the redistribution of funds to

all relevant Airbus entities within the pooling agreement based upon their cash

requirements at the time. Furthermore, those funds not required by other Airbus

entities were then manually transferred into an Airbus SE EUR Master Pooling

Account.

e.      From the Airbus SE EUR Master Pooling Account, excess cash was invested into a

money market fund or bonds (the "Investment Account") or manually transferred

back to the Airbus SE EUR pooling account, should the operational need arise. The

Investment Account is where a bond worth 50,000,000 Euros that commenced on

April 16, 2014 is located.

23.     Airbus has agreed that the Defendant Property is property which constitutes

proceeds traceable to its violation of the AECA and the ITAR, and is subject to forfeiture pursuant

E-7

to 18 U.S.C. § 981(a)(1)(C).

## CLAIM FOR RELIEF
## (18 U.S.C. § 981(a)(1)(C))

24.     The Government re-alleges and incorporates by reference paragraphs 1 through 23 as if fully set forth herein.

25.     Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, constituting or derived from proceeds traceable to a violation of AECA, is subject to forfeiture.

26.     As a result, the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as property which constitutes proceeds traceable to Airbus's violation of the AECA and the ITAR.

## REQUEST FOR RELIEF

**WHEREFORE**, the plaintiff United States of America prays that process issue to enforce the forfeiture of the *in rem* Defendant Property; that, pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeited Defendant Property be condemned as forfeited to the United States of America; and for such other and further relief as this Court may deem just, necessary and proper, together with the costs and disbursements of this action.

Respectfully submitted,

JESSIE K. LIU
United States Attorney
    D.C. Bar No. 472845

ROBERT ZINK
Chief, Fraud Section
Criminal Division

JAY I. BRATT
Chief, Counterintelligence
and Export Control Section
National Security Division

DAVID B. KENT
    D.C. Bar No. 482850
    202-252-7762
KAREN P.W. SEIFERT
    NY Bar No. 4742342
    202-252-7527

ELINA A. RUBIN-SMITH
Trial Attorney
    NY Bar No. 4677548
    202-616-1617
VANESSA SISTI
Assistant Chief, FCPA Unit

DAVID LIM
Trial Attorney
    PA Bar No. 313851
    202-514-0510
ELIZABETH CANNON
Deputy Chief

E-8

_/s/ Zia Faruqui_
ZIA FARUQUI
    D.C. Bar No. 494990
    202-252-7117
Assistant U.S. Attorneys
MICHELLE A. ZAMARIN
Deputy Chief, Fraud
    D.C. Bar No 474240
    202-252-6931
GREGG MAISEL
Chief, National Security
    D.C. Bar No. 447902
    202-252-7812
U.S. Attorney's Office for
the District of Columbia
555 4th Street NW
Washington, D.C. 20530
Karen.Seifert@usdoj.gov
Zia.Faruqui@usdoj.gov
Michelle.Zamarin@usdoj.gov
Gregg.Maisel@usdoj.gov

FL Bar No. 0012147
    202-616-2362
CHRISTOPHER CESTARO
Chief, FCPA Unit
    D.C. Bar No. 982224
    202-353-0726
Fraud Section
U.S. Department of Justice
1400 New York Avenue NW
Washington, D.C. 20005
Elina.Rubin-Smith@usdoj.gov
Vanessa.Sisti@usdoj.gov
Christopher.Cestaro@usdoj.gov

D. C. Bar No. 974755
    202-233-2251
Counterintelligence and
Export Control Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Suite 7700
Washington, D.C. 20530
David.Lim2@usdoj.gov
Elizabeth.Cannon@usdoj.gov

E-9

## **VERIFICATION**

I, Brent Talaga, a Special Agent with the Homeland Security Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement agents and that everything represented herein is true and correct.

Executed on this 31st day of January 2020.


*/s/ Brent Talaga*
Brent Talaga
Special Agent
Homeland Security Investigation

E-10

**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2020, I caused the attached Deferred Prosecution Agreement to be filed by hand with the clerk of the United States District Court for the District of Columbia, and caused the same to be delivered to counsel for Defendant: Robert Luskin, Paul Hastings, 875 15th ST NW, Washington, DC 20005.

Karen P. W. Seifert